Decided 2 July, 1900.

## MENDELSON v. MENDELSON.

[61 Pac. 645.]

### DIVORCE—CRUELTY AND PERSONAL INDIGNITIES.

A husband demanded of his wife that she compel her brother, who lived with them, to pay board. The wife objected to asking the brother to do so, out of gratitude to him for furnishing part of the money for the purchase of the home in which she and her husband lived. The brother was in the habit of coming home very late at night, to the disturbance of the household, and of rising late in the morning, thus disarranging the wife's breakfast plans. He would also sing vile songs in the presence of the family. *Held,* that the fact that the husband requested the brother to leave the house was not such "cruel and inhuman treatment" of his wife as to warrant a divorce under Hill's Ann. Laws, § 495, subd. 6.

### DIVORCE—PROVOCATION—MUTUAL FAULT.

A husband had threatened to inflict, and had actually inflicted, bodily injury on his wife ten years before she sued for a divorce. Both had violent tempers, but she did not fear him. No further trouble occurred between them until shortly before the suit was begun, when she made some exasperating remarks to him, and he told her to go into the house, or he would kill her with a monkey wrench. On another occasion he quarreled with plaintiff and her daughter, and threatened to throw a flatiron at them; calling them "sons of —— and damned fools." A few months later she asked him for money; and he told her: "No; damn you! you have all you will get from me,"—and told her to collect board from her brother, who lived with them, to which she replied, "I will see you in hell first." Defendant gave money to plaintiff's brother, and she called him a "God-damned fool" for doing so. *Held,* that it appeared that defendant's conduct was provoked by plaintiff, and that she was not free from fault, and her suit for divorce was properly dismissed.

From Baker: ROBERT EAKIN, Judge.

Suit for divorce by Etoile Mendelson against Louis Mendelson. From a judgment of dismissal, plaintiff appeals.                                AFFIRMED.

For appellant there was an oral argument by *Mr. Jas. A. Fee.*

For respondent there was a brief over the names of *Chas. A. Johns* and *John L. Rand,* with an oral argument by *Mr. Johns.*

MR. JUSTICE MOORE delivered the opinion of the court.

This is a suit for a divorce, brought by the wife on the ground of cruel and inhuman treatment, and personal indignities, rendering her life burdensome. The cause, being at issue, was referred to J. S. Beckwith; and from the testimony taken by him the court found that the material allegations of the complaint were not substantiated, and rendered a decree dismissing the suit, from which plaintiff appeals.

The parties were married September 5, 1887, and their family consists of their daughter, Ida, ten years old, and Ethel, fifteen years old, plaintiff's daughter by a former husband. The plaintiff testifies that within a year after their marriage the defendant kicked nearly everything in their house to pieces, and a few months before Ida was born he struck her, causing her face to bleed, whereupon she left him and lived with a neighbor about a week, but upon his promise to treat her with greater consideration she returned to their home, the happiness of which was again soon disturbed, for just after their child was born he drove her out of the house with a pistol, saying he would soon end the business; that at his request she undertook to keep a boarder, at whom the defendant threw a plate of soup, and, seizing a carving knife, drove him from the house; that about October, 1897, having made some light remark concerning a harness which the defendant was repairing, he told her that if she did not go into the house he would kill her with a monkey wrench which he then held in his hand, but, remaining where she stood, he came within reach of but did not strike her; that about January 15, 1898, the defendant threatened to throw a flatiron at her and her daughter Ethel, calling them "sons of —— and damned fools;" that about June 8, 1898, she requested him to

give her some money to purchase supplies for the family, to which he replied : "No, damn you! you have all you will get from me ;" and, having said that she would not live with him any longer unless he provided for her necessities, he violently shook her, and, for pulling him away, he told Ethel she must leave the house, and threw a flatiron and a box of dirt at her ; that about July 23, 1898, the defendant told her that she was too extravagant and was keeping too many boarders, for whom he did not intend longer to provide, to which she replied that it was not necessary for him to furnish her any more provisions unless he chose to do so, at which remark he became angry, shook his fist in her face, and cursed and swore at her, saying that he was master there, and intended to see that their household affairs were conducted to suit him, whereupon she left home, and has since lived separate and apart from him.   This is the substance of plaintiff's testimony, and the defendant's acts and language thus detailed constitute the cruel and inhuman treatment and personal indignities of which she complains.   Mr. and Mrs. W. C. Miller, appearing as plaintiff's witnesses, seem to corroborate her testimony respecting a circumstance which she detailed.   They say that about ten years prior to the trial herein, and just before Ida was born, the plaintiff came to their house, in Baker City, crying and holding a blood-stained handkerchief to her face and lips, which were swollen and bleeding. · James Ash testifies that defendant, in answer to a suggestion by plaintiff that it was unnecessary to remove the shoes from a horse that had just been shod, told her to go into the house and attend to her own business, threatening to throw something at her that he held in his hand, but that she did not obey his command, nor did he execute the threat.

The defendant testifies that about June 8, 1898, he took

plaintiff by the arm to lead her into the house, to show her that he had some property therein, whereupon her daughter Ethel struck him and called him a "dirty dog;" that on July 23, 1898, plaintiff having asked him for some money, he told her that, if she needed more money than he was able to furnish, she ought to ask her brother Lawrence, who had been staying with them about nine months, to pay his board, saying that he had secured work, and was then able to pay, to which she replied: "I will see you in hell first, before I ask him to pay board. Not while he lives in this house;" that he told Lawrence the same day that he could not board him any longer, saying that the house would not hold them both, whereupon the plaintiff and her brother told him to leave, which he at first thought of doing, and went away and got a valise, but upon returning he notified Lawrence that he was the person who must leave. The defendant, further testifying, says that plaintiff having requested him to let her brother have some money, he gave him at one time $3.50, and, having so notified her, she said: "You God-damned fool! What did you give it to him all at once for? You ought to give it to me, so I could give him fifty cents at a time." The reason defendant assigned for not keeping plaintiff's brother any longer was that he drank, gambled and visited houses of ill repute, usually returning about 3 or 4 o'clock in the morning, waking him and disturbing his rest; that such dissipation prevented Lawrence from rising in time for breakfast, necessitating the preparation of an extra meal for him, after eating which he would use vile language and sing vulgar songs in the hearing of his daughter and her sister Ethel; and that he heard the latter humming the tune of one of such songs. The defendant denies that he ever struck plaintiff or used bad language in her presence, but she does not deny the profane language so imputed to her, nor is defendant's testi-

mony concerning Lawrence controverted. The difficulty which resulted in the final separation of the parties was caused by the conduct of plaintiff's brother, who, upon being notified by defendant to quit his house, replied that he would not leave. The plaintiff held the legal title to their home, in the purchase of which her brother contributed $200, and he also furnished her $500 to pay off a mortgage she and the defendant had given on the premises. Plaintiff's gratitude to her brother for this financial aid undoubtedly furnishes the reason for her refusal to ask him to pay his board when so requested by the defendant, but, notwithstanding this, the defendant's demand that he should leave was not such cruel and inhuman treatment towards her as to warrant their separation. If it be admitted that the defendant called plaintiff the vile names which she says he did, and that she used the profane language imputed to her, she could not have been very much shocked by what she heard; for her own remarks to the defendant when he informed her that he had given her brother $3.50, and when she was requested to ask her brother to pay his board bill, imply a familiarity with the use of such epithets as she claims the defendant applied to her. That the plaintiff did not seriously fear the defendant is evidenced by the fact that she did not flee when he threatened to strike her with the monkey wrench, though it is true her courage may have been stimulated by the presence of Ash, whom she may have thought able to defend her against his assaults. The defendant was certainly not a model husband, and may have struck plaintiff soon after their marriage, as she testifies; but for more than ten years thereafter, and until June 8, 1898, it does not appear that he laid violent hands upon her, and in that instance the assault was provoked by her. Believing, as we do, that the plain-

tiff was not free from fault, and that she is somewhat responsible for the treatment of which she complains, the decree must be affirmed, and it is so ordered.

AFFIRMED.

Decided 11 June, 1900.