Submitted on motion for additional suit money and motion denied July 13, 1920.

Argued on the merits March 31, affirmed May 17, 1921.

### WHITE *v*. WHITE.

(190 Pac. 969; 197 Pac. 1080.)

**Divorce—Appeal and Error—Suit or Maintenance Money—Jurisdiction.**

1. The Supreme Court has no jurisdiction to grant suit or maintenance money pending appeal from a decree of divorce.

**Divorce—Rule 8 of Supreme Court Relaxed—Respondent's Case Heard on Typewritten Briefs.**

2. In view of extreme poverty of wife, granted decree of divorce, from which husband has appealed, the rule requiring her to furnish printed briefs will be relaxed, and she will be permitted to have her case heard on typewritten briefs.

#### ON THE MERITS.

**Divorce—Evidence Sufficient to Establish Defendant's Cruelty.**

3. In an action for divorce on the ground of the husband's cruelty, evidence *held* sufficient to establish his cruelty.

**Divorce—Compelling Wife to Submit to Abortion Entitles Her to Divorce.**

4. That a husband compels his wife to submit to an abortion entitles her to a divorce on the ground of cruelty and inhuman treatment.

---

1. Allowance of counsel fees and suit money by appellate court, see notes in 3 Ann. Cas. 51; 6 Ann. Cas. 683; 15 Ann. Cas. 229; Ann. Cas. 1915B, 1249.

4. Necessity of personal violence to constitute cruelty warranting divorce, see note in 9 Ann. Cas. 1090.

**Divorce—Where Cruelty is Alleged, the Particular Acts Relied on must be Substantially Proved.**

5. Where cruelty is alleged as a ground of divorce, the particular acts relied on in the complaint to establish it must be substantially proved as alleged.

**Divorce—Evidence of Acts of Cruelty not Pleaded may be Shown in Corroboration.**

6. While a divorce cannot be granted for particular acts of cruelty not pleaded, yet evidence of acts not alleged may be admitted in explanation, corroboration, or aggravation of those specially charged; so, where the act of the husband in tying his wife down while she was pregnant was not alleged, it might be proved in corroboration, etc.

**Divorce—Decree Should not be Granted Where Parties are Mutually Responsible.**

7. A decree of divorce should not be granted where the parties have mutually contributed to the condition complained of.

**Divorce—Divorce cannot be Granted Unless Cruelty Complained of is Unprovoked.**

8. To warrant a divorce on the ground of cruel and inhuman treatment by one spouse toward the other, it must appear that such treatment was unjustified by provocation and was out of proportion to any offense of the complaining spouse.

**Divorce—Allowance of Suit Money for Appeal Proper.**

9. Where the defendant husband appealed from a decree of divorce and the small allowance for suit money had been entirely exhausted in payment of witness fees in the trial court, the Supreme Court should grant an additional allowance sufficient to compensate the wife for her reasonable outlay and expense attendant upon the appeal.

From Linn: Percy R. Kelly, Judge.

In Banc.

This is a suit by Berta K. White against D. C. White for divorce. Pending appeal by defendant from a decree in favor of plaintiff, the respondent files motion in the Supreme Court for suit and maintenance money. Rule 8 of Supreme Court requiring printed briefs relaxed, and respondent allowed to file typewritten briefs.　　　　Motion Denied.

*Messrs. Weatherford & Wyatt* and *Messrs. Hewitt & Sox* for the motion.

*Mr. Dan Johnston, contra.*

McBRIDE, C. J.—This is a motion for additional suit money and maintenance during the pendency of an appeal.

1. The plaintiff sued for a divorce, and obtained from the Circuit Court an order for $60 suit money pending the hearing, which was exhausted in the payment of witness fees and expenses of the trial. She was granted a decree, from which defendant appealed to this court, where the cause is now pending. The affidavit shows that she is practically destitute of means to print briefs, or pay her attorneys, or even maintain herself, pending the trial here; but, as shown in *O'Brien* v. *O'Brien,* 36 Or. 92 (57 Pac. 37, 58 Pac. 892), and in *Taylor* v. *Taylor,* 70 Or. 510 (134 Pac. 1183, 140 Pac. 999), this court has no jurisdiction to grant suit or maintenance money pending a decree.

2. In view, however, of plaintiff's extreme poverty, the rule requiring her to furnish printed briefs will be relaxed, and she will be permitted to have her case heard upon typewritten briefs.      MOTION DENIED.

---

Affirmed May 17, 1921.

ON THE MERITS.

(197 Pac. 1080.)

From Linn: PERCY R. KELLY, Judge.

Department 1.

This is an appeal from a decree annulling the bonds of matrimony theretofore existing between the plaintiff and the defendant. Berta K. White, plaintiff and respondent, and D. C. White, defendant and appellant, were intermarried at Seattle, Washington,

on the sixteenth day of November, 1916. The issue of their marriage is Carol Anita White, born on August 17, 1917, in Linn County, Oregon.

For grounds of divorce, plaintiff alleges that the defendant has treated her in a cruel and inhuman manner and has been guilty of personal indignities, rendering life with him burdensome. She charges, among other things, that by duress defendant forced her and her minor child to leave their home and has since refused to live or cohabit with her; that about the 1st of December, 1916, when plaintiff ascertained she was pregnant with child, the defendant became angry and cursed her, and against the wish and consent of plaintiff the defendant secured an instrument and some medical tablets and attempted to perform an abortion upon her; that defendant failed to provide plaintiff with the necessaries of life, and when in a delicate condition she was forced to seek and do manual labor; that defendant brought into their home two daughters by a former marriage, thirteen and fifteen years of age, and permitted them to insult, humiliate and abuse plaintiff; that when plaintiff was confined in childbirth defendant refused to care for or to secure assistance for plaintiff, and told her his daughters could render her all the assistance that was necessary; that on the seventeenth day of August, 1917, when the girl baby of plaintiff and defendant was born, defendant became angry and expressed his disappointment because said child was not a boy, and that defendant has falsely accused plaintiff of being of unsound mind. Plaintiff prays for a decree dissolving the marriage contract existing between herself and defendant; for the care and custody of their child; for suit money including attorney's fees; for

permanent alimony, and for a third of defendant's real property.

Defendant denies the cruel and inhuman treatment and personal indignities complained of by plaintiff, and sets up a cross-complaint in which he seeks a decree of divorce and prays that he be awarded the care and custody of the said child. His cross-complaint asserts, among other things, that the plaintiff is addicted to the use of bad language; that she has a violent and ungovernable temper; that upon one occasion she attacked him with an iron rake and with her fists, then screamed for help in order to give the impression that defendant was the aggressor; that she has unmercifully beaten the said child; that on February 10, 1919, she attacked defendant and used much abusive language; that plaintiff is abnormal, and that she has wrongfully and without cause vilified defendant and his daughter, whom she designated a "red-headed sow."

In part the court's findings of fact are:

"That plaintiff has not been guilty of the alleged cruel and inhuman treatment of and personal indignities toward defendant as alleged in defendant's answer and cross-complaint herein, nor of any cruel or inhuman treatment of defendant  *  * .

"That defendant has been guilty of cruel and inhuman treatment of plaintiff and personal indignities toward her  *  * .

"  *  * With a disregard of his marital duty *  * defendant has failed to provide a suitable home for plaintiff, by reason of which failure on defendant's part, plaintiff has suffered humiliation, discomfort and inconvenience  *  * .

"That, while plaintiff was enceinte, defendant accused plaintiff of being crazy, although advised by *  * , a skilled physician, that plaintiff was not *  * mentally unsound, although she was experiencing nervousness common to cases of pregnancy;  *  * .

"That without any professional advice so to do, while plaintiff was in the delicate condition aforesaid, defendant, by and with the aid and assistance of his daughters by a former marriage, on several occasions strapped plaintiff down to the bedstead, tying her thereto with a rope; * * .

"That without any just cause therefor, * * defendant represented to his neighbors that his wife, the plaintiff, was crazy.

"That defendant has directed and commanded his two daughters, when they were living with plaintiff and defendant, to disregard plaintiff's requests and to refuse to obey plaintiff * * .

"That defendant has not furnished plaintiff * * with clothing necessary for her use and comfort; but defendant has exacted of plaintiff more work, labor, toil and services than the circumstances reasonably warranted.

"That defendant's attitude and course of conduct toward plaintiff with reference to the approach and advent of their baby was such as to greatly distress plaintiff and to render her unduly excited and morbidly nervous, in that defendant without any just reason insisted that he could not afford to have another child, continually represented to plaintiff that its advent would be calamitous and its necessities and demands difficult if not impossible for him to meet; * * .

"That in discussing with plaintiff the theories approved by defendant with respect to psychical, moral and spiritual phenomena, defendant has evinced a disregard of plaintiff's feelings, and has unjustly reflected upon plaintiff's intellectual capacity to comprehend and her esthetic ability to assimilate the same; and wrongfully, without any cause therefor and for the purpose of wounding plaintiff's feelings, and humiliating and distressing plaintiff, defendant has assumed an unwarranted and indefensible attitude of superiority over plaintiff with reference thereto.

"That defendant wrongfully insisted upon a separation from plaintiff and caused her to leave her

home by threatening that if she did not leave he would institute suit against her.

"That, despite plaintiff's extreme nervousness and manifestly abnormal temperament, due in part at least to her unfortunate and unhappy marital experiences, she, plaintiff, is the proper party hereto at this time to have the care and custody of Carol Anita White, the infant child of plaintiff and defendant.

"That defendant is the owner of the following described real property, to wit:

"Beginning 18.52 chains West of the S. E. corner of the D. L. C. of Geo. Cline, same being Claim 84 in Township 11 South of Range 4 West, running thence North 16 deg. 15 min. West 14.47 chains; thence South 51 deg. 15 min. West 6.00 chains; thence North 38 deg. 45 min. West 3.00 chains to the center of Calapooia Creek; thence along the center of said creek North 34 deg. West 7.64 chains to the center of the Albany and Corvallis County Road; thence South 58 deg. 15 min. West 4.75 chains; thence South 36 deg. West 14.67 chains to the center of the Peoria and Albany County Road; thence along the center of said road South 18 deg. East 5.21 chains to the South line of said D. L. C.; thence East 25.59 chains to the place of beginning, containing 32.14 acres, more or less, all being in Linn County, Oregon; also,

"The North one half of Tract Number Two (2) in Tremont Tracts, Township 11 South, Range 3 West of the Willamette Meridian in Linn County, Oregon, as is shown by the maps and plats thereof now on file in the County Recorder's office for said county, and containing 5 acres; and also,

"The Northeast quarter of the Southeast quarter of Section 36, Township 9 South, Range 3 East of the Willamette Meridian, containing 40 acres in Linn County, Oregon.

"That $15 per month is a reasonable sum for defendant to contribute for the support and maintenance of said Carol Anita White."

Based upon the conclusions of law drawn from the foregoing findings of fact, the court decreed that the

bonds of matrimony existing between plaintiff and defendant be dissolved, and that she be declared to be the owner in fee of one third of the above-described property; that she be granted the custody of Carol Anita White; that the defendant contribute $15 per month to be paid on or before the tenth day of each month thereafter, and that plaintiff recover costs and disbursements.

From the decree defendant appeals, and alleges manifest error on the face of the record, in this:

"That the court erred in its findings of facts Nos. 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 17, and in each of said findings, in that the same were not, and each of them is not, supported by the evidence, and that they are, and each of them is, contrary to the evidence."

AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Dan Johnston.*

For respondent there was a brief over the names of *Messrs. Weatherford & Wyatt* and *Messrs. Hewitt & Sox,* with an oral argument by *Mr. J. R. Wyatt.*

BROWN, J.—3. Did the defendant prove the allegations contained in his answer and cross-complaint? Our answer is in the negative. The trial court said:

"That plaintiff has not been guilty of the alleged cruel and inhuman treatment of and personal indignities toward defendant as alleged in defendant's answer and cross-complaint herein."

We agree with the court in this conclusion. The trial court had the advantage of observing the manner, appearance and demeanor of each witness while testifying. The record shows that each party to this suit was ably represented by counsel. As a witness,

plaintiff was carefully interrogated by counsel for each party and thereafter she was exhaustively questioned by the court. Her open, frank and candid answers to the many inquiries put to her bear the impress of sincerity and honesty. Upon the other hand, there is running through the defendant's testimony a vein of arrogance that reveals the egotism of the man. He would assume the prerogative of the court, for we find that he admonishes the opposing counsel and tells him he is wasting time; that when Plaintiff's Exhibit 3, a letter written by defendant to his wife prior to their marriage, is offered in evidence, he assumes the role of counsel and objects to its introduction. While testifying concerning an incident relating to shaving, the defendant, in referring to his wife, said:

"I did not like to trust myself in the hands of a crazy woman with a razor."

Defendant would have the court believe that it was on account of the plaintiff's relationship,—that is, because she was a sister of his first wife and an aunt of his daughters, that he was "induced to consider her at all"; that, in fact, in their matrimonial venture she was the "aggressor." Defendant's testimony was to the effect that it was upon her solicitations and entreaties that he married her at all. However, while upon the witness-stand, he was confronted with letters in his own handwriting, and from one of which we carve this statement:

"I have before now felt just as much thrill and glamour, but never was it accompanied with the conviction that I was getting the *right one.* There was always a question or a lack of sense of security coupled with it which is missing in this case. My love, natural inclination and judgment are all for you. I am sure you are O. K. as to utility, sincerity and compatibility, and besides, I love you."

He admits to the court that while his wife was pregnant with child and in a nervous and excitable condition by reason thereof, he bound and tied her down with a rope like a wild beast. The record of the trial discloses many instances, and the evidence, occurrences too numerous, that tend to corroborate plaintiff's story as to the defendant's heartless cruelty.

Plaintiff charges the defendant with the most unnatural cruelty. She asserts that contrary to her desire and without her consent defendant secured an instrument and some medical tablets and attempted to perform an abortion on her. She testified in reference thereto, that:

"When I told him that I expected that there was going to be a baby he said, 'That is just like a woman to think that.' And later on, when we both knew it was true, he worried all the time a great deal, and he said we were too poor to have a baby; and I used to go and stay in the office evenings, * * and one evening at the office he said: 'We just simply can't have this baby; we can't afford it.' I says, 'Well, we have to.' And he said, 'Well, we can't afford it, that is all.' * * He said, 'You wait'; and he got up and took his hat and went out of the room and he wasn't gone more than three minutes, I don't believe, three or five, and he must have gone across the road, I judge; he came back and had a paper in his pocket, round-looking, and he unwrapped it and he had a long rubber tube, and he took that tube and he went in the back room out there and got a wire and put inside of it. * * He caught me by the shoulders and he says: 'Now, I am going to go after that little fellow.' I says, 'Oh, Dick, don't; I don't want you to.' He says, 'We can't afford this—don't be foolish, we can't afford it.' And he cleared the desk * * and lifted me on there and said: 'You had better hold still'; and he took the instrument and started to work with it and I made a fuss and he said: 'Have grit;

be gritty; you will have a worse time than this if you don't hold still now.' I made a good deal more fuss and he stopped, but not until he had started a hemorrhage. He took me off the desk, stood me on the floor and I felt weak all over. I says: 'You will have to get a jitney to take me home.' He says: 'You sit on that chunk back of the heating stove'; and, 'You look white; the heat will bring some color to your face.' The chunk was round and rolled and I guess he thought I was going to faint because he held me against his shoulder a long time, and he says, 'Do you feel better now?' I says, 'Let us get up'; and he sat in the rocking-chair and took me on his lap and held me quite a while longer and said: 'Do you think you can walk home now?' I says: 'I will see.' And I got up and walked around the room. I said: 'I feel pretty stiff,' and he says: 'The air will do you good,' and took me home.''

She testified that while defendant was away from home on business, following the event related above:

"He wrote and asked me if the baby had come. I wrote, no, I didn't think it had; there was hemorrhage all the time, but I couldn't tell on account of the pain and hemorrhage, and he got some black pills in Medford and sent me and told me to take them."

Defendant denied much of the foregoing testimony of the plaintiff, but stated:

"While I had planned on raising children of course I admit we hadn't planned on them so early because we hadn't provided a home, and it did inconvenience us."

He said that plaintiff suggested getting rid of the child, but his own story makes him an accomplice:

"So we were up at the office in the Baltimore Building and I trotted down to the store and asked for a catheter (which was introduced in evidence). I brought it back to the plaintiff. She says: 'You have to take that back and exchange it.' She insisted on my taking it back and exchanging it. * * *She*

*finally consented to do her best with it,* with the result that you already know, a failure. * * Later I started on my trip to California. * * I received a letter from her saying the attempt had been a failure so far, and that she wished I would secure her some pennyroyal pills and send her, which I did."

4. It is a well-established principle of law that compelling a wife to submit to an abortion entitles her to a divorce on the ground of cruel and inhuman treatment: *Platner* v. *Platner* (Iowa), 162 N. W. 613; *Dunn* v. *Dunn,* 150 Mich. 476 (114 N. W. 385); *Sheldon* v. *Sheldon,* 146 App. Div. 430 (131 N. Y. Supp. 291); 2 Schouler, Marriage and Divorce, § 1596.

Defendant's treatment of the child subsequent to its birth is a circumstance of much value in the case at bar. Plaintiff testifies that:

"When the baby was five days old he punished it. * * He said he wasn't going to have that brat squalling any more; * * he took it out of bed and shook it hard several times. I says: 'Dick, don't you break its neck,' and he got a cup of cold water and every time the baby opened its mouth he would throw some of that water in."

Plaintiff thus describes one of the whippings of the infant child by the defendant:

"He reached in his hip pocket and pulled out a ruler a yard long when open and folds this way and that [indicating]. * * She was bare, no clothes on except her shirt, and he struck her on the hips * * . I says, 'Dick, have mercy.' He whipped her until the blood * * trickled and at last I picked her up. He says, 'Put that child down.' I says, 'I won't do it.' He says, 'Put her down.' I says, 'I won't do it.' He says, 'Don't you ever expect me to speak decent to you again, for I won't do it. * * Being your child, it condemns her.' "

This took place a few days before plaintiff and the baby left the home.

Mrs. Pellman was present at the birth of the baby. Defendant suggested that she go home immediately after the doctor left. She returned each morning for five days for the purpose of dressing the baby. Nine days after the baby came she went over on Sunday and found Mrs. White crying and White sitting beside the bed, the trouble being, as Mrs. White explained, that White had put the baby in the girls' room across the house to keep her from letting it nurse. She testified: "I think Mrs. White is a good mother," and that she had never seen the defendant show any affection for the child. She further testified about Mrs. White's fleeing to her house for refuge in the night-time, and that the next morning she noticed her thumb was bruised, likewise her nose; that she returned to the White home with Mrs. White that morning, where Dr. Robnett had been called to make an examination as to her sanity, and the doctor, after a short visit, declared that: "It is no case of mine." Mrs. White observed: "It is a case of the judge's."

Corroborating the testimony of plaintiff relating to the abuse of the child by its father is that of Mrs. Ballack to the effect that—

"The child's body at the hips was black and blue in streaks as though it had been hit with a stick or rod of some sort."

And similar testimony is given by a number of other witnesses.

Mrs. Rindquest testified that she sent money to plaintiff (her sister) to come to visit her in Washington; that plaintiff was wearing a hat that she had given her, likewise a dress that she had sent her; that her underclothing was poor and that the greater part of it was made of flour sacks. Witness stated:

"She [plaintiff] showed me the baby's hips, and it had four streaks of blue marks, or black and blue, on its hip at that time."

She further testified that she received a letter from defendant about this time in which he said "she [plaintiff] objected to his correcting the child and he said she was wrong and that he held that every blow administered before a child was a year old was as good as ten afterward," and further stated that "he hoped she [plaintiff] would not be a burden and that he would contribute $8 a month for their support as long as they stayed there."

Mrs. Hinshaw testified that:

"I think Mrs. White is a good mother, and she dearly loves the child."

To like effect is the testimony of a number of women who are mothers of children.

Plaintiff testified that defendant said:

"I didn't work as fast as I ought to; I didn't have as much brains as Thelma and didn't have as much ingenuity as she did, and her mother would peel four potatoes to my one, and that I wasn't bright, saying hateful things of that sort all the time and humiliating me. He said: 'I have apologized to the girls for marrying you.'"

Plaintiff further testified:

"At the time when the horse ran away with me, I was sick with a broken leg and they brought the dishes for me to wipe and everything, the vegetables for me to clean. I was given a little too much exercise, you know; the leg was hurt awful bad and the pan sitting on there at the time, and he [defendant] says: 'You know, a busy family, you must help me.'"

At another time:

"In the presence of the girls he said I was a greater disappointment to him than their mother;

that she was smart and I wasn't, and that 'I have apologized to the girls for marrying you.' "

On a different occasion:

"He grabbed me by the nightgown and jerked me around the room and knocked me against a rocking-chair and rolled the baby cab across the bedroom and made an awful lot of noise, and threw me on the bed and got on me with his knees to hold me. I screamed. He held me there on the bed that way and he said: 'Will you promise me you won't go in that room again if I let you go?' I tried to * * answer. * * I took the baby in my arms. He said: 'Don't you nurse that baby, I tell you.' By this time I had the baby in my arms and he got out of bed on the other side. * * I was afraid he would whack me again. * *"

Plaintiff, who is an Adventist, says defendant ridiculed her religious belief. He endeavored to have her accept what he termed the Science of Natural Philosophy. As a witness she said:

"He had four books for me to read and was very angry because I didn't accept them. That is one reason he thinks I am a fool. The first three books the writer didn't give his name. Dick always told me he was a great master, equal to Jesus, and wanted me to believe it. Later the company sent a * * card addressed to Dick White, saying that another book of the same series was out, and I said: 'Let us get him the book for a Christmas present.' So I washed for Mrs. Reynolds and got $1.50 and Thelma contributed and my girl contributed, and we sent for the book; and when that book came it was simply an exposure of the whole system. * *

"Dick said *he* could be just as great a master if his wife would accept it, but my inability and ignorance and obstinacy kept me from developing my soul because I was a fetter and bound his soul to earth, but if I would accept it and begin to develop myself, * * that 'you would grow to thirteen planes if you would develop your soul.' He said: 'The

100 Or.—26

North American Indians stay right close to the earth while my soul flies to Christ and Socrates.' * *

"And that is the theory he has tried to stuff me with all the time. He calls it the Philosophy of Natural Science. He said I was not capable of developing to the plane that he could; that he was a superman and if he hadn't been encumbered with me his soul could leave his body and get away but I was a fetter pinning him to the earth, and he said: 'You are holding me and you are holding my children to the earth. * * We can't develop our inner life. We can't progress and make the spiritual progress we could if it wasn't for you.' Nearly every day, in one form or the other, during the last year, he said I was mentally incapacitated to ever develop a soul that would go away and come back again like his could. * * On this occasion he called me a big fool, and I said, 'You are the only person that ever called me a fool.' He answered: 'Well, they don't want to hurt your feelings,' and that I was treated as an equal because, 'they do that on account of your honesty, not your intelligence. * * Don't try to tell me you know anything.' He said, 'When I married you I made allowances. I knew your husband was a rascal and your family ignorant, but that you had been handicapped by your environment. * * You are just like a hog. You haven't initiative to undertake soul development. Nature has made you like a hog, develop just so far and your soul is staying right in your body.' "

5, 6. Where cruelty is alleged as a ground for a divorce, the particular acts relied on in the complaint to establish it must be substantially proved as alleged: 19 C. J. 125. However, a well-established rule of evidence in divorce cases is that, while a divorce cannot be granted for particular acts of cruelty which are not pleaded, yet evidence of acts not alleged may be admitted in explanation, corroboration or aggravation of those specially charged: 19 C. J. 130. In

the case at bar the evidence relating to defendant's tying the plaintiff down with a rope was admissible.

7. The plaintiff in this case cannot be said to be entirely free from fault. The testimony discloses outbursts of temper and shows that she is exceedingly jealous. It has been said by this court that:

"A decree of divorce should not be granted when the parties have mutually contributed to the conditions complained of." *Jones* v. *Jones*, 44 Or. 568 (77 Pac. 134); *Wheeler* v. *Wheeler*, 18 Or. 261 (24 Pac. 900); *Crumbley* v. *Crumbley*, 94 Or. 624 (186 Pac. 423).

8. It is the law of this state that the cruelty which lays the legal foundation for a divorce must be unmerited and unprovoked, unless such cruel treatment is unjustified by the provocation and out of proportion to the offense: *Taylor* v. *Taylor*, 11 Or. 307 (8 Pac. 357). In the instant case, the cruelty alleged is proved and is out of proportion to the provocation given by the wife, and she is entitled to a divorce: *O'Brien* v. *O'Brien*, 36 Or. 92 (57 Pac. 374, 58 Pac. 892).

We hold that the divorce in this case was properly granted, and the decree must be affirmed.

9. Plaintiff and respondent has made application to this court for an order granting an additional allowance and suit money from the defendant and appellant. It appears that the only allowance made to plaintiff by the court below for such purpose was $60, which sum was entirely exhausted in the payment of witness fees in the trial of the cause in the Circuit Court. This case is now before us for final disposition upon its merits. We are empowered to grant such additional relief as may seem consistent with the proof submitted respecting the same. This court should allow the plaintiff an additional sum

sufficient to compensate her for the reasonable out-
lay and expense attendant upon the appeal. We
deem $200 sufficient for that purpose, and the decree
here will include the sum of $200, in addition to plain-
tiff's costs and disbursements in both courts: *O'Brien*
v. *O'Brien,* 36 Or. 92 (57 Pac. 374, 58 Pac. 892).

BURNETT, C. J., and McBRIDE and HARRIS, JJ., con-
cur.