Argued February 20; reversed March 19; rehearing denied
April 16, 1935

# MAURER *v.* MAURER
(42 P. (2d) 186)

*McDannell Brown,* of Portland, for appellant.

*Harry G. Hoy,* of Portland (Hoy & Doxey and Arthur E. Prag, all of Portland, on the brief), for respondent.

BELT, J. This is a suit for divorce. Plaintiff charges her husband with cruel and inhuman treatment and he, in a cross complaint, likewise alleges that she had been guilty of the same kind of treatment towards him. In the complaint it is alleged in substance that defendant shortly after marriage began a practice of nagging and browbeating plaintiff; that he frequently

cursed and abused her; that "upon several occasions he committed brutal assaults upon her"—at one time striking her with such force that he broke her eyeglass and caused her eye to be blackened; that "he scratched her face with his fingernails"; that he demanded of her that she go with him into the woods and help him saw wood with a crosscut saw although at such time she was keeping boarders and doing the weekly washing and house-cleaning for two other families; and that he would go for weeks without speaking to the plaintiff or to the children. It was further averred in the complaint that the defendant "apparently had contracted, and was suffering from, a loathsome venereal disease, since which time the plaintiff has declined to live or cohabit with him as his wife".

The defendant in his cross complaint asks for a divorce on two grounds, (1) that plaintiff falsely and maliciously charged him in her complaint with having been afflicted with a loathsome venereal disease, and (2) that plaintiff falsely and maliciously caused the arrest of the defendant on a charge of insanity, thereby resulting in his confinement in the county jail, when at such time she knew that the defendant was not insane.

The trial court, after hearing on these issues of cruel and inhuman treatment, entered a decree of divorce in favor of the plaintiff in accordance with the prayer of the complaint, except that an allowance of $50 instead of $75 per month was made for the support and maintenance of the plaintiff and her minor son 19 years of age. From this decree the defendant appeals.

As is usual in divorce cases, the charges of cruelty as set forth in the complaint are far stronger than the evidence to support them. Plaintiff, according to her own testimony, never went into the woods and worked

with a crosscut saw. She and the children occasionally went to the woods where defendant was working, for a Sunday picnic dinner. During his vacation the defendant cut 10 or 15 cords of wood on his brother's place, for winter use. There is no testimony that defendant ever cursed or brutally assaulted his wife. It is true that he once held her wrists during a heated argument over some trivial matter but never did he strike her or the children. The breaking of the eyeglass and the blackening of her eye were wholly unintentional, as the plaintiff admitted to Reverend Rimbach who testified in her behalf. It occurred while the plaintiff and the defendant, together with friends, were returning home from a party at night in an automobile. The plaintiff and the defendant both admit drinking to some extent. There is no evidence that defendant ever "scratched his wife's face with his fingernails". We conclude that the charges of cruelty against him were greatly exaggerated.

It is not the purpose of the writer, however, to justify the conduct of the defendant. On many occasions he was domineering and overbearing. His sudden outbursts of temper no doubt caused his wife and children to fear him. Such would drive happiness out of any home. Each was suspicious of the other and seemed always ready to engage in a family quarrel. When defendant's violent temper was not aroused, he seemed to be kind and considerate to his family. He carried a $5,000 insurance policy wherein his wife was named as beneficiary. He was a "good provider" although extremely cautious about incurring indebtedness. Eliminating his ungovernable temper, the defendant was not, as his son admitted, a "bad sort" of man.

There was no justification whatever for accusing the defendant of having a venereal disease. The trial court

specifically found that such charge was not true. Neither was there any reason for his arrest on the charge of insanity, causing him to be put in jail for a few hours to await a hearing which resulted in his release. Such conduct on the part of the wife—especially at a time when her husband was ill—can not be condoned.

██ Further review of the evidence would serve no good purpose. We conclude that both parties are at fault and that neither is in court with clean hands. The trial judge, near the conclusion of the taking of the evidence, thus expressed himself about the case: "It is one of those cases where possibly a court might be able to give a decree of divorce to one or the other, but it is also one of those cases where it may not be done; it might be possible and it might not be right. So often no good purpose is served by compelling people to live together in the nominal bonds of matrimony where, as with these people, apparently there has been no marital relationship between them for many years, but, going over this testimony, I say there is not any particular real, honest-to-goodness criticism that one could make of the other which comes, generally speaking, within the definition of cruel and inhuman treatment, taking everything together and drawing an inference, from which a court will be able to say one or the other should have a decree; * * *." It may be, as the trial judge no doubt believed, that the interests of society would be best subserved by granting a divorce in this case, but it is submitted that divorces can be obtained only by the innocent party on some statutory ground. It should not be decreed on the ground of expediency, merely for the accommodation of the parties: *Thomsen v. Thomsen,* 128 Or. 622 (275 P. 673); *Hengen v. Hengen,* 85 Or. 155 (166 P. 525).

The decree is reversed. Neither party will recover costs or disbursements in this or in the lower court.

Rossman and Kelly, JJ., concur.

———

CAMPBELL, C. J. (dissenting). I can not concur in the opinion of my associate on what the evidence shows in this case. These people, residents of Portland, lived together in a fair degree of happiness from the time of their marriage until the year of 1921. At that time, they bought a home for which they agreed to pay $5,900. Of this amount, $3,318 was paid at the time of purchase by money which the wife had inherited from an estate. The balance was secured by a mortgage payable at the rate of $100 plus interest every three months. Defendant was desirous of paying this mortgage as soon as possible. He, being in the lighthouse service of the United States, spent practically one-half of his time away from Portland. The wife took in boarders and out of the money so received she seemed to have clothed herself and the two children, the children being in their 'teens, going to school.

Defendant testified in regard to this arrangement: ''My wife and I, we talked about that and we agreed to—I would pay the butcher bill and all expenses out of my own salary and she use the money just for what purpose I do not know, I have never checked on it.'' He could not remember whether the wife helped to pay the grocery bill, or the light bill, or the water bill. Both parties agree that most of their troubles arose over bills. According to defendant's own testimony, he was very anxious to have the mortgage on the home paid off while the wife wished to get some furniture while paying off the mortgage. ''Mrs. Maurer often com-

plained about her old furniture, felt ashamed of it on account of her friends coming in. As far as furniture was concerned, my first furniture that I bought when I was first married, I was satisfied with it until such time that I could afford to buy new furniture."

The above answer of defendant probably explains most of the difficulties between the parties. You will observe that it is not what *we* wanted, but what "*I* was satisfied with". Many a marriage has gone upon the rocks by the too great exaggeration of the personal pronoun, first person singular. "I will admit I have a temper, but a violent temper or vicious, I wouldn't say that. Q. I will ask you whether or not your temper is of such a character that you are unable to control it or to restrain yourself when you are angry or provoked. A. No, I can always control my temper—something that— an argument—I can control myself."

The writer has known many people in different walks of life who had what is usually called a bad temper, but never knew one who could not control such temper when in contact with his superior, but who would not try to control it when dealing with those he looked upon as his inferior, or under circumstances where he thought he could accomplish his purpose by an outburst of temper.

Defendant testified that he and plaintiff were arguing about two bills that he happened to run across. "I called her attention to it and she says: 'You knew all about that,' and I said: 'No you never told me anything about it.' I said 'don't want to open those bills around town unless you consult me about it first or get my permission,' and she talked back to me and I tried to talk to her in a nice way. I walked on over toward her and grabbed her by her wrist. I says: 'You listen, I

want to talk to you.' 'You keep still and let me talk to you; and I finished what I had to say and by that time while I grabbed her, she made quite a fuss and Mrs. Jones happened to see that from the window and she came running over.''

Defendant was asked: ''Q. Now tell the court what happened on the occasion of this baseball bat episode, that so much has been made of. A. I believe, as near as I can find out or remember, that argument was over a bill, over a Meier & Frank bill, and she talked back to me again and the baseball bat was in the kitchen and I grabbed the baseball bat and just merely pounded on a chair and I says: 'Now listen here, you keep still' and while I pounded on the chair the baseball bat right at the handle broke apart. In the first place it was cracked.''

He further testified it may have cracked the seat of the chair, but did not render it totally unserviceable. He hit it only two or three times when ''it broke right in the middle''. He further testified that: ''Everything seemed to run along smoothly for a while, I would say three or four months and then I would discover something that did not suit me and I talked the matter over with my wife and I wasn't able to reason with her at all.''

''Q. How about sulky spells. A. Whenever we have had our misunderstandings, it provoked me so much that I wouldn't—I would bid them a good morning, to the children and my wife and the same in the evening, but no further conversation—and that would probably last two or three days—sometimes one day.''

Plaintiff testified the defendant struck her in the face, broke her eyeglasses and blacked her eye. Defendant says that he has no recollection of such a

happening, and that when his wife called his attention to it he said it was unintentional and that he was sorry for it. The wife did have a black eye and her glasses were broken.

Plaintiff did not directly charge defendant with being afflicted with a venereal disease. She alleges: "That this plaintiff lived with defendant as his wife * * * for a period of approximately 14 years and declined to live with him further as his wife only when he had been going out and spending his nights away from home quite frequently and apparently contracted a loathsome venereal disease since which time" she refused to cohabit with him. Is such allegation without foundation? Defendant testified that he was cutting up some boxes in the basement and "some of the boxes were quite large, had nails in them and the nail, as I was chopping up boxes, a nail struck me right here (indicating) and cut a deep gash and I immediately treated it. I put mercurochrome on it". He further testified that one of the boarders told his wife about it when she came home from church, and when she asked him he admitted it; that some five or six days afterwards, there was some argument over it and he showed her what happened. "She didn't come out in plain words, that is she says: 'I believe you have something', and I showed her and she seemed satisfied."

Another incident that seems to have excited plaintiff's suspicion, he explained by testifying that on December 17, 1931, while working on a fog signal at Gray's Harbor, he lifted a very heavy flywheel. In doing so, he strained or injured the main gland in his groin and it pained him so much that he fainted. He worked right on to December 24. When he returned home he reported his injury to his superior officer. After the holidays, he kept right on working at light work until January 22

when in dismantling a lathe a part of which with a sharp edge struck him in the same place in the groin. This caused his private parts to swell up and he was laid up for about 15 days, during which time the swelling was reduced by the application of hot-water bottles. These incidents were sufficient to excite the wife's suspicions. The doctor who treated him testified that the defendant never did have a venereal disease.

In regard to the incident on which plaintiff based her complaint of insanity, defendant testified:

"Well, I said in a nice way and meant no harm, I says, 'I wish you would keep the children quiet;' She wasn't in a rage, but in kind of a sarcastic way she says, 'Oh, you expect too much around here; you want everybody to wait on you'. I says, 'You repeat that again and—' I says, 'I might make it pretty hot for you' or words similar to that; I didn't know just what—I was in bed; and just got up like I was going to get up out of bed and she rushed down stairs and rushed outside."

Then after testifying that his wife came back in the evening, and told him that she and the children were leaving, and did leave, he continued, that the next morning about 11 o'clock three deputy sheriffs came and took him down to see the judge; that one of the deputy sheriffs had to help him dress. At the court house the doctor examined him on the insanity complaint and discharged him. The next day he went back to his work and continued working thereafter. If he was so ill the day of his examination that the deputy sheriff had to help him dress, he made a wonderfully quick recovery. Taking into consideration his temper and his actions generally in connection with the threat of making it "pretty hot for you", we cannot say that plaintiff was wholly unjustified in having him examined.

The plaintiff accused defendant of staying out nights. He testified that he stayed out late only occasionally; that he could only remember staying out all night one time and that on that occasion he called his wife about 11 o'clock the next day and told her that he "stayed all night with Wally". Wally, he explained, was a brother of plaintiff's sister's husband. Such explanations of staying out all night are generally very unsatisfactory to the wife.

On defendant's own testimony, plaintiff is entitled to a decree of divorce. The decree of the circuit court should be affirmed.