Submitted on briefs November 12; reversed December 2, 1947

## PARKS *v.* PARKS

187 P. (2d) 145

*Allen & Roberts,* of Portland, for appellant.

*Clifford G. Schneider,* of Portland, for respondent.

WINSLOW, J. (Pro Tempore)

This is a divorce case. Both husband and wife seek a severance of the marital ties which they so solemnly declared were binding ''until death do us

part'' only such a short time ago. A son has been born, now ten years of age. Both seek his custody. The marriage vows were exchanged at Vancouver, Washington. We intend no reflection upon our sister state to the north, but if one may judge from the cases which come to this court, where the parties see fit, for one cause or another, to leave local surroundings and friends and journey north to Vancouver to have this solemn ceremony performed, one would almost be justified in saying that such a beginning forbodes disaster. This case is no exception. Is it possible that people who take this journey do not consider their obligation binding in Oregon, or have these sacred vows so deteriorated that today they are a mere formality—a farce, if you please?

The record in this case is sordid, depressing—almost nauseating. Both charge cruelty. Let us very briefly consider these charges. The appellant, the husband, admits using physical violence upon his wife, but attempts to justify by saying she kicked him. A poor justification for a gentleman. He admits attempting to chloroform his wife while she was asleep, but again he says he wanted to make a physical examination of his wife to ascertain whether or not she had been assaulted. Appellant must certainly think the courts are very credulous.

Now let us draw the curtain a bit further and look at the other side of the house. She too makes some admissions. She admits that she has been ''off to the races'' at the Meadows Race Track and that she was ''quite a frequenter of that place,'' while her husband says, and she does not deny it, that during the horse racing season she went ''many nights through the week and she has been gone every week-end.'' She admits

that at these races she met a gentleman friend who furnished her a pass to the races, gave her tips on the horses, and took her to Celilo Falls to buy fish; that he gave her his picture, exhibit 6, and she had her picture taken with his car, exhibit 5; and that she may have put her arms around him. She admits having some of her films developed under a fictitious name. She complains about her husband's drinking, and rightly so, but was finally compelled to admit that she likewise indulges considerably. She attempted to maintain that she had quit drinking "about four years ago" but, when confronted with a liquor permit issued to her by the Oregon Liquor Control Commission for 1943, she stultifies herself by saying that she secured it for friends. She admits calling her husband many foul names, but attempts to justify by saying "he asked for it." A poor excuse for a lady. She admits writing to her husband the following note:

"Well, kid, have your fun. Oh no, you never go out a night. I have had a swell time and I don't intend to stay home and feel sorry for myself."

When these admissions are considered, along with other charges and evidence in this record which were denied by her, she does not occupy an enviable position before the court. Moreover, respondent was not forthright in giving her testimony. She was evasive, impudent, surly and excitable, displaying every evidence of a guilty conscience. At times it took the court and counsel for both sides to induce her to answer a simple question. As the court told her, she was not doing herself nor anyone else any good by such conduct. Now she holds out her hands in pretended innocence and asks this court to put its stamp of approval upon a decree of divorce in her favor. If we were to dis-

pose of this case upon the principle of "comparative rectitude," such a course might be justified. 1 Nelson, Divorce and Annulment (2d ed.) 363, § 10.03; 17 Am. Jur. 269. Yes, both sides charged cruelty, and they both proved it. Where does that leave the parties?

The doctrine of comparative rectitude is contrary to sound public policy as enunciated by the decisions of this court. Many arguments are advanced in support thereof. It is said that, since the parties cannot agree, why continue them in lawful wedlock; that the personal liberty of each of the parties demands that these ties be severed and they be permitted to go their way rejoicing; that you can deny a divorce, but you cannot make the parties live together, or love one another, or re-establish the home; and that, even where this doctrine is repudiated in theory, it exists as a matter of fact, because most of the divorces are granted upon the default of one of the parties, and, under such circumstances, the courts never know the whole truth.

In the commercial world one is not permitted to violate his solemn compact with impunity, 12 Am. Jur. 881, 13 C. J. 627, 17 C. J. S. 930; nor is relief granted to one who breaches his covenant, either in law, 13 C. J. 725, 17 C. J. S. 1169, or in equity, 58 C. J. 1161. Why should a different rule apply where we are dealing with a sacred institution?

The personal liberty argument is based upon a misconception of the meaning of that term. In *Fitzsimmons v. New York State Athletic Commission,* 146 N. Y. S. 117, the appellate court of that state said:

" 'Liberty' is a word with a double meaning. In a negative sense it means freedom from restraint. In a positive sense it secures freedom by the imposition of restraint. It is in this positive sense that the state, in the exercise of its police and

general welfare powers, promotes the freedom of all by the imposition of such restraints upon some as are deemed necessary to secure the general welfare.''

Daniel Webster in a speech delivered before the South Carolina Bar Association put it this way: ''Liberty exists in proportion to wholesome restraint.''

Thoughtful deliberation upon these statements will impress one with the fundamental soundness thereof. Our traffic regulations, our sanitary restrictions, our pure food laws are all wholesome restraints upon us, as well as on all other members of our community. By these laws one is not permitted to drive where he pleases, or to sell what he pleases, or dispose of his garbage and sewage where he pleases. Nevertheless, by these same restraints, we may drive in comparative safety, eat pure food, and enjoy life without the stench and contamination of our neighbors' sewers and debris.

So here, if, by refusing to dissolve these bonds of matrimony and thus restraining these parties in their personal desires, society is thereby, to a small degree at least, stabilized, and, if the same restraints are placed upon other couples similarly situated, again strengthening our social fabric, that which now seems to these parties to be a deprivation of their personal liberty will in fact be an enhancement thereof. They will be privileged to live in a society where there is less crime and less juvenile delinquency, to say nothing of the more wholesome effect of perhaps a few more happy homes.

Here we are again met with the argument that you can deny a divorce to these parties, but you can't make them love one another or re-establish this broken home. Regardless of all that may be said in these fields, one thing is certain: That if a divorce is denied these

parties and they refuse to settle their differences and effect a reconciliation, or put in order the pieces of this broken home, or straighten out their tangled skein of living, at least they cannot, either of them, go out and start another home, to crumble and fall when the storm strikes. That by itself may be a saving to society. Moreover, it is just possible that, if the courts of our land would show a disposition to be less liberal in this field, it might have a wholesome effect upon married couples in inducing them to try harder to maintain this sacred relationship.

Divorce is an ancient institution. The early biblical law of Moses permitted a Hebrew "to put away his wife by a written bill of divorcement." Deuteronomy, C. XXIV, vs. 1-4. Divorce was frequent and easy among the ancient Greeks. In ancient Rome for five hundred years there was no divorce, but toward the end of the Republic it required nothing more than the mutual consent of the spouses. In England the early ecclesiastical courts granted limited divorce, from bed and board, sparingly. Until 1857 only Parliament could give complete divorce. In the American colonies, where ecclesiastical courts were never established, jurisdiction was reserved to the Governors and Councils and later to the Legislatures of the states. From this extreme, in the United States we have now gone far toward the opposite. The pendulum has swung too far. Today there is one divorce for every three marriages. 19 Tenn. L. Rev. 930. In 1945 in four of the most populous counties of Tennessee, there were 6,738 marriages and 9,889 divorce cases. The question might well be asked: Can society maintain itself half married and half divorced?

With reference to the argument that the doctrine of comparative rectitude exists in fact where it is

repudiated theoretically, it may be readily admitted that most divorces are obtained by default, and that the courts do not ascertain the whole truth. In fact it is reported that in Hamilton County, Tennessee, one judge granted twelve divorces in seventeen minutes. 19 Tenn. L. Rev. 930, 934. On the other hand, it should be remembered that there are three parties to every divorce case—the husband, the wife and the state. If the time has come when the courts take judicial notice that in most default divorce cases a fraud is being perpetrated on the court, it is time to call a halt even there, and require the state to become more than a perfunctory party.

In this case an American home is involved—a home welded and cemented together by the strong and weighty ties of solemn marital vows; a relationship sanctioned by God and man as the first step in stable, organized society; an American home, the keystone to the arch which supports and sustains our whole social fabric; the hallmark of righteous living. Every intendment, implication and suggestion of public policy dictates, yes, demands, that this home be restored, stabilized and maintained. The future of a child, a boy ten years of age, in involved. Statistics demonstrate that a large percentage of our mounting juvenile delinquency comes from broken homes. Public policy demands that this trend should stop, that the courts cease putting their stamp of approval upon a course of conduct that may destroy the foundation of society itself, except in those cases coming unmistakably within the purview of the law.

In the early case of *Beckley v. Beckley*, 23 Or. 226, 231, 31 P. 470, this court said:

"To entitle one to a decree of divorce for cruel and inhuman treatment, the injured party must

come into a court of equity free from the suspicion that he has contributed to the injury of which he complains. Divorces should not be granted by weighing the evidence and decreeing in favor of the one least guilty, where both have taken an active part in the mutual discord. Equity relieves the injured party, but not the vanquished. In the struggles for supremacy, or to vent spleen, spite, or hatred, the willing actors may fight out the battles of wedded life, but they cannot invoke the aid of equity after their own efforts have failed."

Again, in *Evans v. Evans*, 176 Or. 403, 419, 157 P. (2d) 495, this court, speaking through our present Chief Justice ROSSMAN, said:

"In another recent instance, Mauer v. Mauer, 150 Or. 130, 42 P. (2d) 186, this court said:

" 'It may be, as the trial judge no doubt believed, that the interests of society would be best subserved by granting a divorce in this case, but it is submitted that divorces can be obtained only by the innocent party on some statutory ground. It should not be decreed on the ground of expediency, * * *,'

"In that case, the decree awarded to the wife in the circuit court was reversed."

■ In *Hollingworth v. Hollingworth*, 173 Or. 286, 292, 293, 145 P. (2d) 466, this court, speaking through Justice BRAND, said:

"It is firmly established by the decisions of this court that he who comes into equity must come with clean hands, and that this doctrine is applicable to divorce cases. Carmichael v. Carmichael, 106 Or. 198, 211 P. 916 (1923). When the conduct of the parties is reprehensible to a kindred degree, the court ought not to interfere at the instance of either. Matlock v. Matlock, 72 Or. 330, 143 P. 1010 (1914); Crim v. Crim, 66 Or. 258, 134 P. 13 (1913); White v. White, 100 Or. 387, 190 P. 969, 197 P. 1080

(1921); Squires v. Squires, 115 Or. 655, 239 P. 302 (1925); Hill v. Hill, 124 Or. 364, 264 P. 447 (1928); Billion v. Billion, 124 Or. 415, 263 P. 397 (1928); Smith v. Smith, 146 Or. 600, 31 P. (2d) 168 (1934); Heisler v. Heisler, 152 Or. 691, 55 P. (2d) 727 (1936); Douglas v. Douglas, 163 Or. 689, 99 P. (2d) 479.''

In *Mueller v. Mueller,* 165 Or. 153, 156, 105 P. (2d) 1095, this court, speaking through Justice BAILEY, said:

''The conclusion to which we are impelled is that neither party is entitled to a divorce. Both husband and wife materially contributed to the discord which prevailed in their home. The conduct of the plaintiff toward his wife and children was anything but commendable.

''We have carefully examined the entire record and are of the opinion that both the plaintiff and the defendant were in the wrong. The evidence does not preponderate decisively in favor of one or the other. Neither of them can be said to have been very slightly, and the other very greatly, at fault. Billion v. Billion, 124 Or. 415, 263 P. 397; Mauer v. Mauer, 150 Or. 130, 42 P. (2d) 186; Beckley v. Beckley, 23 Or. 226, 31 P. 470; Andrews v. Andrews, 162 Or. 614, 94 P. (2d) 300.''

In *Andrews v. Andrews,* 162 Or. 614, 615, 94 P. (2d) 300, this court, speaking through Justice BELT, said:

''The mere fact that the plaintiff and the defendant seem convinced they cannot live together in peace and happiness does not justify this court in dissolving the marital relation. The parties must be left where we find them. It is hoped that common sense and righteousness may yet prevail in this disturbed household.''

In *Douglas v. Douglas,* 163 Or. 689, 693, 99 P. (2d) 479, this court, speaking through Justice KELLY, said:

''The other incidents relied on by plaintiff are controverted or explained; and we concur with the

trial court that plaintiff did not establish a cause for divorce.

"We cannot concur, however, in the conclusion that defendant established a cause of divorce. To constitute a cause for divorce on the ground of cruelty, the cruelty must be unmerited and unprovoked unless it is unjustified by the provocation and out of proportion to the offense. Subject to that rule, where both parties contribute by misconduct to marital discord, neither is entitled to a divorce. Taylor v. Taylor, 11 Or. 303, 8 P. 354; Adams v. Adams, 12 Or. 176, 6 P. 677; Wheeler v. Wheeler, 18 Or. 261, 24 P. 900; Beckley v. Beckley, 23 Or. 226, 31 P. 470; Mendelson v. Mendelson, 37 Or. 163, 61 P. 645; Jones v. Jones, 44 Or. 586, 77 P. 134; Crim v. Crim, 66 Or. 258, 134 P. 13; Matlock v. Matlock, 72 Or. 330, 143 P. 1010; Spady v. Spady, 79 Or. 421, 155 P. 169; Hengen v. Hengen, 85 Or. 155, 166 P. 525; Crumbley v. Crumbley, 94 Or. 617, 186 P. 423; White v. White, 100 Or. 387, 190 P. 969, 197 P. 1080; Hawley v. Hawley, 101 Or. 649, 199 P. 589; Kruschke v. Kruschke, 103 Or. 601, 205 P. 973; Billion v. Billion, 124 Or. 415, 263 P. 397; Thomsen v. Thomsen, 128 Or. 622, 275 P. 673; Josephson v. Josephson, 132 Or. 581, 287 P. 80."

In *Claude v. Claude,* 180 Or. 62, 174 P. (2d) 179, 186, this court, speaking through Justice Lusk, said:

"The plaintiff's association with Anderson, long continued, renewed and persisted in after the reconciliation with her husband, was, in our opinion, such marital misconduct as to constitute ground of divorce. It was the thing in fact which broke up their marriage. By comparison such fault as the believable evidence shows the defendant to have been guilty of is slight, and his provocation was great. In these circumstances we think the defendant is entitled to a decree of divorce. See Fritz v. Fritz, Or., 174 P. 2d 169; Fuller v. Fuller, 175 Or. 136, 140, 151 P. 2d 979; McElwee v. McElwee, 171 Or. 462, 467, 138 P. 2d 208; Mueller v. Mueller,

165 Or. 153, 156, 105 P. 2d 1095; Condit v. Condit, 115 Or. 481, 237 P. 360.''

In *Fuller v. Fuller*, 175 Or. 136, 140, 151 P. (2d) 979, this court, speaking through Justice HAY, said:

"We are not satisfied that the plaintiff was entirely without fault in the premises. As we read the record, she seems to have been somewhat neurotic, and very jealous of defendant. In all probability, she was not entirely well physically. We cannot say, however, that the parties were in pari delicto, or that the plaintiff's shortcomings were not justified by provocation, or were disproportionate to her treatment by the defendant, in view of the evidence to which the decision of the trial judge imputed verity. Under the circumstances, we do not feel that her faults were sufficient to debar her from relief in a court of equity. Vinson v. Vinson, 111 Or. 634, 226 P. 233; White v. White, 100 Or. 387, 190 P. 969, 197 P. 1080.''

The foregoing will give a fair cross-section of the thinking of the different members of this court as now constituted.

In *Hollingworth v. Hollingworth*, supra, we said:

"The social wisdom of the doctrine which, because of mutual fault, continues the marriage status as a matter of law when it has necessarily ended as a matter of fact has been the subject of severe criticism in recent days, but this court is committed to the doctrine that a plaintiff cannot have relief in equity unless he comes to court with clean hands, and if it ever is to be applied in a divorce case we think it should be done here.''

■ We hold that respondent is not before this court with clean hands, and that sound public policy adhered to by this court for many years requires that the decree entered herein be reversed. May we add in the

language of *Andrews v. Andrews,* supra, "It is hoped that common sense and righteousness may yet prevail in this disturbed household."

■ In this case respondent has asked this court for an allowance for attorney's fees in the sum of $250 for defending this appeal. Since the appellant saw fit to appeal from the decree rendered by the trial court, it was necessary for respondent to defend the appeal. We have considered the length of the transcript of evidence, the briefs filed on behalf of respondent and the fact that the case was not orally argued in this court, but submitted upon briefs. We find that $200 would be a reasonable allowance for such purpose.

It follows from the foregoing that the decree of the lower court is reversed and that respondent's complaint as well as appellant's counterclaim are dismissed, and respondent is allowed $200 attorney's fees for defending this appeal, respondent to recover her costs and disbursements herein.

Bailey, J., concurs in the result.