Argued October 9; affirmed October 23, 1945

# SPATH v. SPATH

(162 P. (2d) 511)

Before BELT, Chief Justice, and ROSSMAN, KELLY, BAILEY, LUSK and HAY, Associate Justices

*John H. Kelley,* of Portland, for appellant.

*Thos. H. Tongue, III,* of Portland (Thos. H. Tongue, Jr., of Hillsboro, on the brief), for respondent.

BAILEY, J.

This is a suit for divorce, brought by the wife against her husband, on the ground of cruel and inhuman treatment. The acts of the defendant, which plaintiff alleges constituted cruel and inhuman treatment, are set forth as follows: (1) That on different occasions defendant has threatened her life, causing her to be in constant fear of him; (2) that on February 11, 1945, defendant "grabbed plaintiff by her wrists and arms and twisted them, causing her intense pain"; (3) that defendant, without any cause whatsoever, is "intensely jealous and falsely accused plaintiff of having immoral relations with other men"; (4) that defendant is quick-tempered, and without provocation "flies off the handle" and "nags at and finds fault with" her; (5) that defendant frequently becomes intoxicated and "when in that condition is mean and quarrelsome"; (6) that defendant on two occasions threatened to cause her bodily injury if she attempted to leave with the children; and (7) that defendant is parsimonious and would not furnish her sufficient funds with which to purchase the necessary clothing for herself and children. She asked for the care and custody of the minor children, $2500 as alimony in gross, $70 per month for the support, maintenance, and education of the minor children, an additional $50 per month for her support and maintenance, and to be decreed the owner of certain household goods, furniture, and personal property.

Defendant filed an answer in which he denied all the allegations of the complaint, except that he admitted that the plaintiff and defendant were residents of Washington county, Oregon, that they were married

and were the parents of two minor children, as alleged in the complaint.

Special findings were entered by the court in which it found in favor of plaintiff on the first six specifications of cruel and inhuman treatment hereinbefore enumerated. No finding whatsoever was made on the seventh specification.

The decree awarded plaintiff a divorce, $1000 as alimony in gross, $25 per month additional for her support and maintenance, the custody of the two minor children, $50 per month for their support and maintenance, and certain specified household goods, furniture, and personal property. From this decree defendant has appealed.

Defendant questions the sufficiency of the evidence to support the findings of the circuit court and decree entered thereon. He does not complain, however, in the event plaintiff is entitled to a divorce, of awarding the mother the custody of the children, of the granting of alimony to her and support money for the children, or of decreeing her to be the owner of the personal property.

Plaintiff and defendant were intermarried on the 19th day of October, 1933. Since their marriage they have resided on a 100-acre farm near Sherwood, Oregon, owned by the defendant's father. Two children have been born as issue of the marriage, both sons, one eight years of age and the other three years of age at the time of the institution of this suit in February, 1945.

■ The only issue in this case is one of fact. The principal witnesses were the plaintiff and the defendant, and much of the testimony given by them is conflicting. The trial judge, who had an opportunity to see the plaintiff and defendant and observe their de-

meanor on the witness stand, resolved the conflict in their testimony in favor of the plaintiff. Under such circumstances, great weight should be given to the findings of the trial judge. *Baier v. Baier,* 172 Or. 83, 139 P. (2d) 562; *Fowler v. Fowler,* 158 Or. 568, 76 P. (2d) 1132.

We have read the entire record and are impressed with the straightforward manner in which the plaintiff gave her testimony. She was positive in stating defendant's acts of cruelty with which she had charged him. On the other hand, defendant, in many instances, was evasive in answering questions propounded to him, even those of his own attorney. The following references to his testimony, all on direct examination, are typical and will suffice to show this characteristic.

After defendant stated that he did not want his wife to have a divorce because "I don't believe in them", he testified as follows: "Q. Are you willing to start over again and endeavor to make a go of it? A. I don't know. Q. Are you willing to,—you know whether you are willing to or not. A. I might. Q. Are you willing to try? A. I wouldn't say for sure.

The defendant was also asked whether he had stated to his wife that if she ever attempted to leave "she wouldn't go all in one piece", to which he answered, "I don't remember of it, no." He further testified: "Q. Well, did you? You know whether you did or not. A. I said that? Q. Yes. A. I don't think I did. Q. Do you know whether you did or not? A. I didn't."

In answering the charge that he had accused his wife of immoral relations, defendant gave the following testimony: "Q. She has testified that you have accused her of immoral relations with her brother and

with your brother. Have you ever accused her? A. I actually never accused her, but I have heard when I was combining, heard talk around there— Q. (Interrupting) Just a minute— I am just asking you if you ever at any time accused her of immoral relations? A. Never came right down and accused her, no.''

The defendant admitted that on February 11, 1945, he twisted the plaintiff's arms but stated that he did it jokingly. He denied that he held her arms back of her, as she had testified.

Plaintiff testified that on one occasion her husband demanded of her the automobile keys and when she refused to give them to him he told her if she did not that ''he was going to beat my head off''. Mrs. Mary Wallace, plaintiff's sister, corroborated her testimony. Defendant gave considerable evidence concerning this incident but did not deny that he had made that statement.

There was introduced in evidence by the plaintiff a piece of cardboard approximately 6½ inches by 2½ inches, on which was written in lead pencil the following: ''Marked woman you are Helen. Means death.'' Plaintiff testified that on a certain day, when she left home, her husband was there, and on her return she found this piece of paper in the cupboard where she kept her purse. She further stated that the writing was that of her husband. He positively denied that it was his writing and further stated that he had not seen the paper before the day of the trial. He submitted for comparison a sample of his writing apparently made after the cardboard had been identified by the plaintiff. This writing consisted of the following sentence, written in lead pencil: ''Find out what hired man''. During the trial there was considerable

questioning about different hired men and we assume that this sentence was written by defendant as a reminder to his attorney.

The circuit court was requested by counsel for defendant to compare the handwriting on the cardboard with that of the plaintiff's handwriting in evidence and also the above-mentioned sample of defendant's handwriting. The plaintiff's signature appears on the verification of the complaint and on two affidavits. In addition thereto, there was introduced in evidence an account book kept by plaintiff in which she recorded her receipts and disbursements. Defendant's signature appears on the verification of the answer, on an affidavit and on three checks. Two of these checks were made payable to Helen Spath.

The capital "H" and the letters "l" and "n" in the word "Helen" on the cardboard are almost identical with the same letters in the word "Helen" on the two above-mentioned checks. The letters "th" in the word "death" written on the cardboard have the same general characteristics as the "th" in his signature. In many instances, in writing his signature, upon completion of the letter "h", he continues with an upward stroke to cross and recross the "t" and "h" in a circular fashion. The "th" in "death" was made in this manner. The writing on the cardboard does not in any way resemble that of Mrs. Spath but has many of the peculiarities, besides those already mentioned, found in defendant's handwriting. It is our opinion that the writing on the exhibit hereinbefore referred to was that of the defendant and that it was written as a threat.

■■ The defendant's accusations that his wife was having immoral relations with other men were false

and without foundation, and constituted ground for divorce. *Dietz v. Dietz,* 158 Or. 13, 72 P. (2d) 60, and cases therein cited. There is no doubt that defendant, not only by words but by acts, threatened to do bodily injury to plaintiff. By his conduct defendant was guilty in other respects of cruel and inhuman treatment which rendered plaintiff's life burdensome. We are satisfied that the findings of fact and decree of the court are supported by the overwhelming weight of the evidence.

■ Plaintiff has filed a motion, supported by affidavits, in which she requests that this court allow her $250 as attorneys' fees in this court. The circuit court allowed the plaintiff the sum of $150 as attorneys' fees. Defendant, not being satisfied with the decree of the circuit court, has appealed to this court, thereby compelling plaintiff to procure counsel to represent her here. It is difficult to ascertain the defendant's financial status, but we believe that he can and should be required to pay to plaintiff a reasonable amount as attorneys' fees. After consideration of the entire record, and based upon the authority of *Goodman v. Goodman,* 165 Or. 141, 152, 105 P. (2d) 1091, and the cases therein cited, we think that $250 is a reasonable amount to be allowed plaintiff as attorneys' fees in this court, and it is so ordered.

The decree appealed from is affirmed.