Argued October 1; modified October 8, 1940

# GOODMAN *v.* GOODMAN
(105 P. (2d) 1091)

*P. J. Gallagher*, of Portland, for appellant.

*Howard P. Arnest*, of Portland, for respondent.

BAILEY, J. This appeal is prosecuted by the defendant from a decree granting a divorce to his wife.

The plaintiff, Helen J. Goodman, and the defendant, Samuel Goodman, were married at Vancouver, Washington, April 20, 1937. Mrs. Goodman was then past 70 years of age and Mr. Goodman was 66 years old. They had met for the first time in November of the preceding year at a health resort on the coast, where each had gone for curative baths. Both parties had previously been married.

At the time of their marriage the plaintiff was the owner of a piece of property on which were a filling station, cabins and camp ground, near Rex, Oregon, which property was later sold for $5,000. She also owned a nineteen-acre farm near Newberg, Oregon, which after the marriage of the parties was traded for residential property in Portland. The defendant owned 1,300 acres of land in Harney county, Oregon, some 200 acres of which had water rights and the remainder was grazing land with a value of about 50 cents an acre. Part of the land was homesteaded by the

defendant in 1909. After this suit was instituted the defendant sold his ranch for $5,000.

Before they were married the parties to this litigation discussed plans for the future, and it was decided that their living and household expenses would be borne on what they termed a fifty-fifty basis. It was planned to sell the service station, as neither of the parties felt able to carry on in the future the business therewith connected. The question of going to Harney county to live on the defendant's ranch was discussed, also, and as to this the defendant thus testified:

"Q. And you knew at the time you married her that she never had any intention, and you had no expectancy, of ever having her live with you in Harney county; isn't that true? A. Well, that is true, yes."

The plaintiff and the defendant lived on the service station property from the time they were married, in April, until January of the following year. The defendant did as much work about the premises as he was physically able to do, in helping to paint the cabins and improve the grounds for a possible sale, but he contributed no money toward the living expenses of himself and his wife. When the property was improved the plaintiff was able to dispose of it at the price hereinabove mentioned.

Mrs. Goodman spent about $500 of the proceeds of that sale in improving the house on her nineteen-acre farm. According to her testimony, this improvement was undertaken with a view to making the farm their future home, while the defendant testified that the sole purpose of spending that sum was to enable the plaintiff to sell the property and acquire a home in Portland.

The parties hereto moved to the plaintiff's farm in the early part of 1938. It was soon apparent, how-

ever, that the defendant was unable to do the necessary work about the farm. He became dissatisfied with living there and in June of that year the farm was exchanged in an even trade for their home in Portland, the value of which was given by the defendant as between $1,500 and $1,800.

While they were on the farm, the defendant testified, he "bought at least a third of the grub consumed". The plaintiff gave the following testimony as to the attitude of the defendant while living on the farm:

"Well, he just puttered around and did whatever he wanted to do, and he didn't like it, and he didn't take any interest in it, and he was mad all the time about it because he didn't like it. He didn't want it."

Asked how she knew that the defendant was "mad", the plaintiff further stated:

"Well, he wouldn't talk, nor he wouldn't say anything, and he was sulky, and he didn't care to do anything or take any interest in it. One day I asked him if he wouldn't buy a cow and I would buy fifty chickens and we would have something to make our living on, and he never answered me at all. He wouldn't buy it and he would . . . he never answered me; he ignored me; and I didn't say anything. . ."

The parties had not resided in Portland very long before an illness from which Mrs. Goodman was suffering became worse. At first she was able to get around, although with difficulty, but later she was confined to her bed. The defendant was troubled with rheumatism. He wanted to go back to Harney county, and discussed that matter with his wife, who, according to her testimony, told him that she did not want to be left alone in the condition in which she then was. Seeing that he was determined to go, she testified, she engaged Mrs. Cravens, an old friend of hers, to come

and stay with her, and then, in the language of the plaintiff, Mr. Goodman "packed up everything he had, winter clothes and summer clothes, and took all the tools and everything to go up there to see about his hay in July." In referring to the first time that he departed for Harney county after marrying the plaintiff, the defendant testified that his wife was ill when he left, so that it was necessary for her to have help and attention, but he had talked over the matter with her and she had said that he "couldn't do any good there" and that he "couldn't help her any". He further testified that his wife "had sent and got Mrs. Cravens to stay with her."

About two weeks after her husband left for Harney county, Mrs. Goodman's condition became worse and she went to a hospital, where a major operation was performed upon her. When she was able to leave the hospital she returned to her home for a short time and then entered a convalescent home, where she remained for a month. The defendant did not know that his wife had gone to the hospital until he received a letter from Mrs. Cravens. It is not clear when that letter was written, but the defendant testified that upon receiving it he "came right down" to Portland. He further stated that the man for whom he worked was "coming to Portland anyway and I thought . . . well, I went along." The next morning after coming to Portland, however, the defendant returned with his employer to Harney county. At that time his wife was in the convalescent home.

For some two months after Mr. Goodman first returned to Harney county he worked for two dollars a day, and later for forty dollars a month. He was engaged, he testified, in "handling stock, horses and

cattle, and doing all kinds of ranch work." At no time did he offer to contribute toward the support of his wife or the expenses of her illness.

When Mrs. Goodman became able to travel, in October, 1938, she went to Wisconsin, where she remained three months, visiting her relatives. Before going there she wrote to her husband, stating that she intended to make the trip.

Late in 1938 or early in 1939 the defendant wrote to the plaintiff, requesting that she return to Portland. At that time he was living at their home in Portland. The plaintiff did return some time in January, although the date is indefinite. The parties had not been together very long, however, until the husband again felt a yearning for Harney county, and on or about February 5 or 6 he bade the plaintiff "good-bye, as nice as you please," she testified, and "said he would be back in two or three days."

After leaving home, nevertheless, and before going to Harney county, the defendant consulted a lawyer in Portland about procuring a divorce from his wife. This lawyer on February 6, 1939, wrote to Mrs. Goodman, telling her about Mr. Goodman's consulting him in regard to a divorce, and requesting her to call at his office to talk over the matter. Mrs. Goodman, although greatly surprised by her husband's action, she testified, did call upon the attorney. He informed her, according to her testimony elicited upon cross-examination by the defendant's counsel, that the defendant had talked about her "and said he wouldn't live with you, that you were so mean, and all that." This testimony was not controverted.

The defendant's attention was directed by his counsel to the letter written to his wife by the attorney

whom he first consulted, and the defendant testified in that connection as follows:

"I went to [the attorney first consulted] and I told him that I would like for him to talk to her because I couldn't, and see what she would be willing to do.

"Q. Why did you do that, Sam? What was your idea of a separation? A. Well, I seen that there was no chance for us to get along and she had told me flat-footed that she expected me to keep her, and that was all there was to it, and I would take care of her, and my only chance to earn a dollar is to get out."

On cross-examination the defendant was asked whether, when he consulted an attorney about a divorce, he wanted to obtain a divorce from his wife, and he thus testified:

"Why, I thought it was about time. We couldn't make any agreement ourselves. I couldn't talk to her.

"Q. When did you make up your mind you wanted a divorce? A. Why, she made up my mind for me quite a while ago.

"Q. Well, when was that? A. That I couldn't tell you, just when it was.

"Q. Well, was it when you were in the filling station business at Rex? A. No, sir, it wasn't there, but I think that I saw that there had to be an end after we had moved into Portland here.

"Q. Did you ask her to move out of Portland? A. No, I never asked her to move out of Portland. It was absolutely useless.

"Q. You just decided things were not to suit you and you would just pick up and go off and let her go; is that the situation? A. Not exactly that. I tried to talk to her and there was no such thing as talking to her. I tried to talk to her in January, I guess it was, before I went to [the attorney first above mentioned] and all I got out of her was that I was going to take care of her, that is all there was to it.

"Q. She needed somebody to take care of her, then, didn't she? A. I thought her pretty well able to take care of herself.

"Q. You didn't want to take on the job? A. I had had the job for quite a while."

Mrs. Goodman testified that when she returned from Wisconsin her husband said to her, "We ought to quit, we couldn't agree and we couldn't get along." She asked him what she had done, and he answered, "Nothing." She wanted to know, "What is the matter?" And his answer was, "We can't get along." She said to him, according to her testimony, "We can get along, if you want to . . . There is no use saying we can't, because we can."

It is apparent from a consideration of the entire record that Mr. and Mrs. Goodman lived together without any friction while operating the service station. After they moved to Mrs. Goodman's farm the defendant became restless, or discontented, and sullen. If he did not want to move to Portland, at least he did not remonstrate against so doing. The reason he gave at the trial for going to eastern Oregon was that he could not find work in Portland. He admitted that it was understood prior to their marriage that he and the plaintiff were not to live in Harney county. He asserted that he intended to buy a farm in the Willamette valley which he could work, but admitted that he had no money whatever with which to buy such a farm.

At the time of the trial the only property that Mrs. Goodman had was the residence in Portland and less than $700 in money remaining from the sale of the service station. The balance of the $5,000 had been spent in improving the house on her farm, for living expenses and the cost of her illness. The only money

that the defendant gave her during their marriage was $10.

This suit was instituted March 9, 1939, and in April of that year the defendant contracted to sell his ranch in Harney county for $5,000, of which amount he received $3,000 in cash. He then purchased what he terms a five-unit apartment house in Salem for $4,500, paying $3,000 in cash and assuming a mortgage for the balance. He did not discuss with his wife either the sale of the Harney county ranch or the purchase of the Salem property. At the time of the trial he apparently was in better financial condition than when he married the plaintiff.

In her complaint the plaintiff alleges that the defendant "treated her in a cruel and inhuman manner and with personal indignities", and sets forth a summary of the defendant's conduct much as we have hereinabove narrated in detail.

On this appeal the defendant for the first time questions the sufficiency of the complaint to sustain a decree of divorce in favor of the plaintiff. He also urges that the evidence in the case is insufficient to support the decree. These two questions may well be considered together, for the reason that the evidence in the record is in accord with the allegations of the complaint.

■ In *Neely v. Neely*, 162 Or. 610, 94 P. (2d) 300, this court said:

"The view that actual bodily harm or apprehension thereof must be shown to authorize granting a divorce on the ground of cruelty, has been generally repudiated and the modern doctrine is that any unwarranted conduct by either spouse which causes the other mental suffering of sufficient degree constitutes such cruelty as will authorize a divorce."

In support of this statement the opinion cites 19 C. J. 49, § 88, and *Steele v. Steele*, 96 Or. 630, 190 P. 716. See also: *Billion v. Billion*, 137 Or. 622, 1 P. (2d) 1108, 3 P. (2d) 1113, and *Fowler v. Fowler*, 158 Or. 568, 76 P. (2d) 1132.

■ Mrs. Goodman appears to have done everything in her power to make the marriage of these parties congenial and to keep their home harmonious. On the other hand, Mr. Goodman has shown a disposition to shirk every obligation arising from this marriage and a determination to end the relationship. He evidenced a morose and sullen nature while in his wife's presence and continually told her that they should "quit" and that they could never "get along". His actions showed plainly that he had no affection for her and no concern for her comfort. Without going further into the facts, we believe that the conduct of the defendant was such as to cause the plaintiff mental suffering of sufficient degree to constitute cruelty. We are, therefore, of the opinion that the defendant's contentions that the complaint does not state facts sufficient to constitute a cause of divorce and that the evidence does not show cruel and inhuman treatment on the part of the defendant toward the plaintiff are not well taken.

The defendant filed a cross-complaint asking for a divorce from his wife, and he assigns as error the refusal of the trial court to grant him a divorce, although he does not seriously press the matter upon us. We think that there is no merit in this assignment of error.

In the decree granting the plaintiff a divorce the court also gave her judgment against the defendant in the sum of $125 as attorney's fees. The granting of attorney's fees in the decree awarding the plaintiff

a divorce is the basis of another assignment of error. The decree was entered February 20, 1940. On April 4, 1939, the court entered an order denying the plaintiff's motion for suit money, attorney's fees and temporary support. No further order with reference to attorney's fees was thereafter made, except that included in the decree.

Section 6-913, Oregon Code 1930, reads in part as follows:

"After the commencement of a suit, and before a decree therein, the court or judge thereof, may, in its [or his] discretion, provide by order as follows:

"1. That the husband pay, or secure to be paid, to the clerk of the court, such an amount of money as may be necessary to enable the wife to prosecute or defend the suit, as the case may be, and also such an amount of money as may be necessary to support and maintain the wife during the pendency of the suit; . . ."

 It has been held in numerous cases in this state that the allowance of suit money, which includes attorney's fees, or temporary support, is limited strictly by the terms of the statute: *State ex rel. Tolls v. Tolls*, 160 Or. 317, 85 P. (2d) 366, 119 A. L. R. 1370. It has likewise been uniformly held by this court that an order for attorney's fees can be made only after commencement of the suit and before decree: *Billion v. Billion*, 122 Or. 68, 256 P. 389, 256 P. 769; *Carlton v. Carlton*, 156 Or. 33, 65 P. (2d) 1417; *Thomsen v. Thomsen*, 118 Or. 614, 228 P. 832, 245 P. 502, 247 P. 808. When an interlocutory order is made providing for suit money, the court may incorporate in the decree a judgment for the amount allowed: *State ex rel. Tolls v. Tolls*, supra; *Carlton v. Carlton*, supra; *Billion v. Billion*, supra.

 The plaintiff sets forth in her brief what she asserts is a part of the written opinion of the circuit judge

who heard the case, and contends that the reference therein to the amount of money which plaintiff should receive as attorney's fees is tantamount to an order. The purported opinion of the circuit court is not a part of the judgment roll and is not an order (§ 7-301, Oregon Code 1930), nor was it intended as such by the trial judge. It is not a part of the record in the case: *Thomsen v. Thomsen*, supra; *DeCou v. Howell*, 190 Cal. 741, 214 P. 444; *Outlook Farmers' Elevator Co. v. American Surety Company*, 70 Mont. 8, 223 P. 905; *Colvin v. Clark*, 96 Wash. 282, 165 P. 101. "It is an opinion merely and possesses no strictly legal efficacy, and is not entitled to be made part of the record", although we might consider it "as we would the opinion of any court upon questions of like character": *Thomsen v. Thomsen*, supra.

■ Since no interlocutory order was made by the court allowing the plaintiff attorney's fees, the decree appealed from must accordingly be modified by eliminating therefrom the amount attempted to be allowed for such fees.

■ The plaintiff has here requested that an additional allowance of $250 be made her as attorney's fees on this appeal. After consideration of all the facts in this case, and upon the authority of *White v. White*, 100 Or. 387, 190 P. 969, 197 P. 1080, and *Thomsen v. Thomsen*, 128 Or. 622, 275 P. 673, we are of the opinion that $200 is a reasonable amount to be allowed plaintiff as attorney's fees in this court. The decree herein entered will so provide.

As hereinabove modified the decree appealed from is affirmed. The plaintiff will recover her costs and disbursements in this court.

BELT and BEAN, JJ., not participating.