Suit for divorce by Mary M. Flanagan against Terry A. Flanagan.
The Circuit Court of Union County, R.J. Green, J., entered a decree granting plaintiff a divorce and awarding her an undivided one-fourth interest in real and personal property owned by defendant and defendant appealed.
The Supreme Court, Bailey, J., held that plaintiff was entitled to a divorce on ground of extreme cruelty and to an undivided one-fourth interest in defendant's realty, but that evidence did not justify additional award of any interest in his personal property and that decree should be modified accordingly.
DECREE MODIFIED AND AS MODIFIED AFFIRMED.
In this suit, brought by Mary M. Flanagan against Terry A. Flanagan, plaintiff asks that she be granted an absolute decree of divorce from defendant, and that she be awarded an undivided one-half interest in the real property owned by defendant and judgment against him for $13,800 in lieu of an undivided one-half interest in his personal property. From a decree granting plaintiff a divorce and awarding her an undivided one-fourth interest in and to the real and personal property owned by the defendant, the latter has appealed.
The complaint alleges that plaintiff and defendant were married at La Grande, Oregon, on or about March *Page 128 
3, 1945, and that no children have been born as the issue of such marriage.
Paragraph IV of the complaint enumerates the alleged acts of cruelty committed against plaintiff by defendant. It reads as follows:
 "That the defendant has treated the plaintiff in a cruel and inhuman manner, inflicting indignities upon her, making her life burdensome and in particular, as follows:
 "That during the past two years, preceding the commencement of this suit, the defendant has insisted that the plaintiff perform many of the arduous and more disagreeable chores around the farm, upon which they live.
 "That the plaintiff has been required to milk the cows, feed the pigs and care for the chickens. When the plaintiff has objected to performing these outside chores, the defendant has become very disagreeable, has exhibited a violent temper toward the plaintiff. The plaintiff, in order to avoid such a treatment by the defendant, has continued to do the said chores, in addition to preparing the meals, doing the family washing and all other normal household duties.
 "On many occasions, while the plaintiff has been performing the farm chores, the defendant has been away from the farm, visiting with neighbors.
 "That the defendant has expected the plaintiff to remain close to the farm and whenever she leaves the farm, to visit with her own friends, the defendant has objected.
 "In addition to doing the farm chores, the plaintiff has gone out to the grass fields and hoed grass, for 6 to 7 hours a day and at the same time, prepared the meals and performed her usual household duties.
 "That the defendant has on many occasions, used profanity toward the plaintiff, spoken in a rough and discourteous manner to her. That the *Page 129 
defendant has objected to the plaintiff purchasing new clothing. That during the three years of their married life, the defendant has permitted the plaintiff to expend, not to exceed $75.00, upon clothing for herself.
 "That the defendant has not been considerate of the feelings of the plaintiff and on many occasions has indicated to her, a lack of faithfulness and disinterest in respecting his marriage obligations.
 "Shortly after the parties were married, the defendant told the plaintiff that: `I owe no woman anything.' That during the past winter, the defendant told the plaintiff that he saw nothing wrong about going out with other women and on one occasion, said: `I don't see any harm, if she's willing and I'm willing.'
 "That the defendant is disagreeable around the house and gives the plaintiff only very short answers when she attempts to talk with him. The defendant leaves the home of the parties and the farm and never tells the plaintiff where he is going. That the defendant never confides in the plaintiff, as to any of the business matters concerning the farm. That the defendant handles all of the money and the plaintiff is denied money, except for the bare necessities. That the plaintiff, at the time the parties were married, had $300.00, which she had saved from her earnings. That the defendant suggested that the plaintiff give the money to him, to be placed in a joint bank account. That the plaintiff did give the said money to the defendant, but that the defendant did not and has not at any time, opened a joint bank account. That the defendant kept the plaintiff's money and that the defendant has not returned the same to her.
 "That the plaintiff is the first to arise in the morning and is forced to make the furnace and kitchen fires, while the defendant remains in bed. That the defendant frequently goes to the neighbors, *Page 130 
to play cards and on one occasion, when the plaintiff did not wish to go, the defendant told her that she could take her clothes and move out.
 "That on or about the 21st day of October, 1948, after the plaintiff had done her usual household and farm chores, including the milking of 5 cows and separating the milk and washing the separator, the defendant requested the plaintiff to take their pickup to the garage, to be repaired. The plaintiff agreed to do this and the defendant was to call for the plaintiff at the garage and take her back to their home. The defendant then left the house and after the plaintiff had finished with the milking chores, she went out to get the pickup and found that the defendant and his truck were gone. The plaintiff then took the pickup to Martin's garage, in Island City, for repair. She looked for the defendant, but he was not there and was informed that he had been there but that he had gone away without her. The plaintiff then left word at the garage that she would wait for the defendant at the Halfway Market, where her sister resides. The plaintiff left the pickup at the garage for repair and walked to her sister's place. The plaintiff remained at her sister's home, but the defendant failed to call for her, until two days later, at which time the defendant came to the Halfway Market, while the plaintiff was in La Grande and said: `If she (referring to the plaintiff) doesn't want to stay home, she can come and get her clothes.' The defendant then left, without waiting for the plaintiff to return. During the afternoon of that day, October 23rd, the plaintiff returned to their farm home, but could not find the defendant. The plaintiff thereupon picked up her personal belongings, consisting of her clothes, fancy work and bedding, which had been purchased by her and returned to live with her sister. That said parties have been living separate and apart from said time.
* * * * *" *Page 131 
Plaintiff further alleges that defendant "is an able-bodied person, who owns real and personal property valued at many thousands of dollars and is capable of earning and does earn a yearly net income of between $8,000.00 and $10,000.00"; that he is the owner of certain described real property in Union County, Oregon, and certain personal property located on said real property, and that his earnings have been the result of the joint efforts of plaintiff and defendant.
Defendant, in his answer, admits the allegations of the complaint relating to their marriage and that they have no children. He admits that during the past two years plaintiff has assisted in doing the chores on the farm and that during the busy farming season, when he was working long hours in the field, plaintiff did most of the chores. He denies that he ever insisted on her doing this work, and alleges that she did the same voluntarily. He admits that plaintiff worked in the grass fields on a few occasions but denies that she was required to do this work. He admits that after their marriage plaintiff turned over to him some $300 in money "which was used in buying furniture and fixing up their home". He admits that on occasions plaintiff "gets up first in the morning and builds the fire and starts preparing breakfast", but he denies that she was required to do so, and alleges that she did it voluntarily. He admits that on or about October 21, 1948, he requested plaintiff to take their pickup to the garage to be repaired; that he went to the garage later but plaintiff was not there and, after waiting for her for some time, he returned home; and that later, while he was absent, plaintiff came to their home, packed her clothes and personal belongings, departed, and has not returned. Defendant admits that he is *Page 132 
able-bodied and that he owns "real and personal property to the value of a few thousand dollars". He denies the allegation as to his yearly income. He admits that he owns the real property described in the complaint, "having acquired the same by purchase and inheritance prior to his marriage to the plaintiff," and alleges that such property is subject to a mortgage, which he has been attempting to pay off in yearly payments. He admits that "plaintiff has worked and assisted in running the farm since the marriage of the parties and that what income they have earned has been the result of their joint efforts". Defendant denies all the allegations of the complaint not "specifically admitted, alleged or qualified" in his answer.
Defendant sets forth two assignments of error. He asserts that the court erred (1) in granting to plaintiff a decree of divorce, and (2) in awarding her an undivided one-fourth interest in defendant's real and personal property.
At the time of their marriage defendant was about 32 years of age. Plaintiff's age is not disclosed by the record. Prior to their marriage defendant had inherited from his father 80 acres of valuable farm land in Union County and had purchased a 55-acre farm in that county, about two miles distant from the 80-acre tract. At the time of the trial there was a mortgage of about $4,700 against these two tracts. There is on the 55-acre tract, where plaintiff and defendant resided, a modern six-room house with full basement and equipped with furnace, lights, telephone and running water. After their marriage defendant bought for the home a cook stove, a combination radio and phonograph, a refrigerator, an electric washing machine, and floor lamps. He gave plaintiff an electric mixer, an electric roaster, an electric iron, and a radio. *Page 133 
Defendant has "a pretty near complete farming equipment" on which he owes approximately $1,000.00. He testified that at the time of the trial he had "seven cows and two brood sows; and I think there are three young calves, about eighty, ninety or a hundred head of chickens," and about six ducks. At one time there were as many as 54 pigs on the place.
On the 55-acre tract there is a small tract of timber, the exact acreage of which is not disclosed, some alfalfa and pasture land, and approximately 13 acres devoted to the raising of grass seed, which "is a very expensive crop to start", the first year's expense being somewhere between $30 and $50 an acre. In the cultivation of grass seed much help is necessary and both men and women are employed. About one-half of the 80-acre tract is planted to wheat and peas and the other half is summer-fallowed. In addition to these two tracts of land the defendant farms 110 acres, owned by Louis A. Dierks, on a crop share basis, 60 acres of which were in grass and the balance in fall peas. Defendant's net income for 1946 was $1,611.24 and for 1947 it was $2,575.42. The 1948 net income had not been computed at the time of the trial.
Regarding the chores which she did Mrs. Flanagan testified as follows:
 "A. I have done most of the milking and the chores. We would get up, and he would say, `If you will do the chores I'll go to the field,' or he would have something else to do; and he would say, after breakfast, `I haven't time to do the chores; if you will do the chores I'll go on.'
 "Q. Did you do the chores every day? A. Either every day or help.
 "Q. What did they consist of? A. Milking; feeding the pigs; I always fed the chickens, and lots of times ran errands for him. *Page 134 
 "Q. Was that true in the summer time as well as in the winter time? A. Yes.
 "Q. Also true in the winter time. A. Yes; I helped with the chores.
 "Q. Were there occasions when you did all the chores, milked all the cows and fed all the pigs, and so on? A. That is right.
* * * * *
 "Q. If you felt this work was burdensome to you why did you continue to do these chores? A. Well, as his wife I tried to help him out.
 "Q. Any other reason at all? A. Well, to keep things going, to keep a little peace, not cause any more argument than had to be.
 "Q. Did you feel your refusals to do any of these chores, or any objections, resulted in arguments or breaking the peace of the family, would you say? A. It would have if I had done it very much."
We now quote Mr. Flanagan's testimony as to the circumstances under which plaintiff did the milking. It is as follows:
 "Q. Who did the milking? A. Well, my wife helped me during the busy season, and occasionally during the other parts of the year. I mean occasionally, just very seldom, because I took care of most of that myself.
 "Q. But during the harvest season, and farming? A. Starting in '45 we started combining and started as early as we could get in the field, and also put lights on the combine, and many nights worked until after dark.
 "Q. During that season she did — A. (Interrupting) She done the chores, practically all of them.
 "Q. Did she ever object or complain about any of these chores? A. Yes, in '46, when I had hurt my finger in the combine, got the end took off — it *Page 135 
was about a year and a half before I could properly use that finger again — we had four cows. She objected to milking them, so we dried them up, and I later sold them. That is why we milked two last year.
* * * * *
 "Q. Now, along there, at that time, was there any trouble between you? Did she object to such an extent as to cause a family disturbance? A. No; about the only trouble I knew of was her objection to milking the cows, and we dried them up. This summer, due to the specially short season we had, we had a lot of work crowded into a very short while; starting with about right after the first of August, when I went into the harvest field, I told her she would have to take care of the chores or we would have to dry the cows up if she didn't want to take care of them, and she did; and when we finished harvest about the first of September, I had so much work in the grass fields I told her I have got so much to do I wouldn't have time to do the chores, and if she didn't want to do it we would have to dry the cows up at that time; but she didn't seem to object to doing the chores and was milking the cows up to the time she left."
Mrs. Flanagan stated that her husband had suggested "a time or two" that she "dry up the cows" and that she "Usually did; sometimes they was giving too much milk; it was hard to dry them up." She testified that it took her from one hour to one and a half hours to do all these chores and that she usually finished them by 7:30 or 8:00 o'clock; that when defendant was working the Dierks place he generally took his lunch with him, sometimes she took it to him and sometimes he came home for lunch; and that at night he had a very light meal, often consisting of bread or crackers and milk, sometimes waffles or hot cakes. She had no one else to prepare meals for. *Page 136 
During the farming season defendant would spend long hours in the fields. Mrs. Flanagan stated that he "would usually leave the house at 7 or 7:30, but during the wheat harvest he might leave a little earlier, so they could grease the combine", and that sometimes he did not come home until about 6:30 in the evening.
Plaintiff alleges that, in addition to doing the farm chores, she "has gone out to the grass fields and hoed grass, for 6 to 7 hours a day and at the same time, prepared the meals and performed her usual household duties." She testified that one fall she worked about two weeks taking stray grass out of the field and during that time she worked "pretty near all day." She said:
 "It was when I was hoeing grass a year ago last summer, was when I worked only half the day.
 "Q. Anybody else raising grass around there? A. Yes.
 "Q. And that pulling of the weeds out of the grass, and hoeing grass is done largely by women and girls? A. Not altogether.
 "Q. But there are lots of women and girls that work at that? A. Some of them.
* * * * *
 "Q. During hoeing time in fact your husband hired some people to help hoe? A. Right.
 "Q. There were women and girls in those crews? A. There was a number in the crew.
 "Q. Did he demand you go out and hoe grass, refuse to hire anybody? A. He didn't refuse to hire anybody. He said, `Let's you and I go out and hoe grass, and weed."
Mr. Flanagan testified that his wife "helped some in the grass field. I don't recall just how many days, but she did come out and hoe some, I believe" in 1946, and again in 1947 "she helped two different days." He *Page 137 
further stated that he has "seen as many, or more, women working in the grass fields as I have men." Asked if he demanded that she go out and work in the fields, he answered, "No, but I did explain to her that all the help we could keep from hiring would give us that much more money."
Plaintiff charged that defendant "used profanity toward" her. She testified that he used profanity toward her on occasions too numerous to mention. Asked on cross-examination, "What did he ever call you", she answered, "Well — I don't remember now."
She also alleges that "during the three years of their married life, the defendant has permitted the plaintiff to expend, not to exceed $75.00, upon clothing for herself." Concerning this matter she said: "He never objected to my buying everyday clothes, but when I approached him for better clothes he would not say much, but the next day or two he would say we would have to cut down on expenses; we needed the money; so I let it go." Mr. Flanagan, in answer to the question whether they had ever "had any trouble over money matters, clothes", stated, "Well, any time she asked me for money, when I had it to spare, I gave it to her. There have been several times I have been very low on money, and I have asked her numerous times to cut down on all spending, because of the shortage of money."
Mrs. Flanagan testified that her husband asked her to get up, build the fire, and get breakfast while he was still in bed; that sometimes she objected, "and he didn't like it, so therefore I got up and made the fires." Concerning this matter she testified:
 "Q. This getting up and building the fires; when did that happen? A. I started doing that the first *Page 138 
summer we were married. He would say, `You get up and build the fires and get breakfast, I can sleep a little longer;' and the next time he would say, `You get up and make the fire and let me rest a little longer.'
 "Q. That was during the season spring, fall, summer, when the farm work was heavy? A. That was the first summer we were married, in the spring, and most of the work was in the summer.
"Q. And you did it? A. Yes.
 "Q. Didn't object at the time? A. Well, he asked me to; I tried to be obedient and help him out. He asked; and at times demanded it."
We now quote from Mr. Flanagan's testimony:
 "Q. There has been some talk here about her getting up and building the fires. What is the facts about that? A. Well for about two or three weeks before she left, I was working, tried to get out just as shortly after daylight as possible, worked until after dark. I was tired, awful tired, and told her if she would get up and make the fires it would give me a little more rest, which she did, because up to the time she left I hadn't had Sunday off since the Fourth of July, and I was getting awful tired.
"Q. She make any objection to doing this? A. No.
 "Q. That was just building a fire in the cook stove? A. Yes. We wasn't using the furnace at that time; and at other times she has got up occasionally and built the fires in the morning.
 "Q. Did you ever have any knowledge this was causing her to be miserable and unhappy? A. No."
The plaintiff testified that she suspected her husband of "having an affair" with her younger sister, who was married, had a family and lived in La Grande; *Page 139 
that she "had seen a lot that was going on in between them; and he slipped off and was going down there."
 "Q. So you were jealous of your younger sister? A. I seen too much going on between them.
 "Q. So that is what brought up these discussions of a man's duty to be faithful, and all that stuff? A. Yes.
 "Q. But your husband always denied he was ever untrue to you? A. He never said he didn't.
 "Q. He didn't say he didn't? A. No, but he never did admit he did. He told me that time, `If she is willing, and I am willing, there is no harm in it.'
 "Q. Wasn't he talking about conduct prior to marriage, at that time? A. No, sir; we were discussing, talking right there."
Plaintiff further testified that defendant had told her several times, "`I don't owe a woman anything,' and there was no harm in him stepping out when he wanted to, in fact he said he would whenever he got ready to. Q. Did he ever make any statement to you as to whether he saw any wrong in doing that type of things? * * * A. He said that when I question about them, he said, `I see no harm in it, if I am willing and she is willing.'"
We now quote Mr. Flanagan's testimony on cross-examination concerning the statement attributed to him, i.e., "I don't owe a woman anything", as follows:
 "Q. You stated you owed no woman anything? A. I would like to have it defined; I don't know what it means.
 "Q. I am not asking you to define it. Did you make such a statement? A. No, I never made any such statement; and furthermore I don't know what it means. *Page 140 
 "Q. * * * A. I don't recall making the statement * * *."
Defendant testified that his statement about "stepping out" with other women had reference to what occurred before they were married.
Mr. Clayton Towell, plaintiff's brother-in-law, testified that defendant made the statement to him "one or two different times, that he thought it was perfectly all right for him to change wives with anyone else", and that that statement had been communicated by him to Mrs. Flanagan. Mr. Flanagan stated that he did not recall making that statement to Mr. Towell; that it was possible he was talking to him "about that subject"; that he was not talking about changing his wife for some other woman, but if other people wanted to change wives he did not "know as there is any particular grounds to object on; it wouldn't be any of my particular business, that I know of." He testified that it "is not my belief" that it is "perfectly all right" to change wives.
Plaintiff testified that when she objected to doing the chores her husband made the statement several times that "a woman should help, to pay for her board." Defendant said, "I don't recall ever telling her that. I might have, in a joking way, but I don't recall it."
Mrs. Flanagan had an older sister, Mrs. Towell, living near Island City, whom she used to visit. She testified that her husband told her a number of times that if she did not "quit talking about going" to her sister's "you can take your clothes and go down there and stay." Defendant testified that one evening he and his wife had a quarrel which wound up by her threatening "to leave me and go to her sister's". He *Page 141 
told her, he said, that "if she done that, to take her clothes along".
On the 21st day of October, 1948, Mrs. Flanagan, at the request of her husband, drove their pickup to Martin's garage in Island City for repair. She was to meet her husband there later. However, he had arrived at and left the garage before her arrival. She testified: "And I waited in the pickup for a while; I thought maybe he had come back, maybe he had another errand to do and he would come back. He didn't. I left word that I would be at my sister's, in the Halfway Market. I walked there, and waited all that day for him, and he never did show up." Defendant later returned to the garage and, not finding his wife there, went home in his truck. Two days later he went to the Halfway Market to see if his wife was at her sister's. She was not there and he left word that "if she wasn't planning on coming home, to come get her clothes * * *." He went from there to Arlington on business. In the afternoon of that day plaintiff did go to her home, packed her clothes, departed, and has not returned.
The following testimony of defendant explains why he did not attempt to contact his wife after he called at the Halfway Market on October 23rd:
 "Q. Now, after the plaintiff came out and got her clothes there on October 23d, and after your visit to the Halfway Market on that Saturday, did you ever call up the Halfway Market, or go there again looking for her? A. I did not.
 "Q. Never made any attempt to look her up after that? A. I felt she knew where her home was and if she didn't wish to stay there I didn't see that there was much for me to do about it.
 "Q. Didn't make any difference to you if she *Page 142 
didn't want to come back there? It was O.K. with you? A. I have made it a practice not to run after women.
 "Q. You thought if she would come back and stay there, all right; if not, it was O.K. with you? A. I felt if she didn't wish to maintain her home and stay in it, that was up to her. I done my best to furnish a home and make things as nice as possible; and that was about all that I could do."
Plaintiff testified that when defendant "failed to come after" her it "was just the last straw."
Concerning the effect that defendant's acts had upon her plaintiff stated:
 "Q. What effect, Mrs. Flanagan, did this conduct of the defendant have on you, particularly his statements to you concerning his attitude toward going out with other women, and not owing any woman anything? What effect did that have upon you? A. Plainly, it hurt; and there is not much to stay there for, if that is the attitude he takes.
 "Q. Has that been the attitude he has taken? A. Yes, part of the time it has.
 "Q. Do you feel that has made your life burdensome? A. There is no use staying out there if that is the way you are going to live; there is nothing to work for.
 "Q. What is the situation as to whether you feel you can continue on in your marriage relationship under those circumstances? A. I don't feel like I can."
Probably too much space, in both the transcript of testimony and in this opinion, is given to matters closely connected with farm life. The testimony relating thereto consists of incidents which, for the most part, might be classed as trivia and, if they caused friction at the time, which we doubt, should have been *Page 143 
forgotten in the usual give-and-take of married life. In doing work on the farm, such as helping with, or at times doing all of, the chores, weeding and hoeing seed grass, building the kitchen fire, etc., plaintiff was, in our opinion, voluntarily assisting her husband in his work and probably was not doing any more work than, or any different work from, that done by many other wives under similar circumstances.
We do not, however, regard as a trivial matter the statements attributed to defendant, which we believe he made. Statements by a husband to his wife, under the circumstances here delineated, that "I don't owe a woman anything", that there is no harm in his stepping out when he wanted to, that he would whenever he got ready to, that "I see no harm in it, if I am willing and she is willing", that "a woman should help to pay for her board", and that if she did not "quit talking about going" to her sister's, "you can take your clothes and go down there and stay", constitute, in our opinion, extreme cruelty under the statute, although no personal violence was inflicted or threatened. § 9-907, O.C.L.A. (amended Or. L. 1949, ch. 154);Neely v. Neely, 162 Or. 610, 94 P.2d 300; Goodman v.Goodman, 165 Or. 141, 149, 105 P.2d 1091; Sabot v. Sabot,97 Wn. 395, 166 P. 624; 17 Am. Jur., Divorce and Separation, § 49, p. 174. There was also a marked indifference on the part of defendant toward his wife. Defendant's conduct toward plaintiff was unjustifiable and, as stated by plaintiff, caused her such mental suffering as to utterly destroy the legitimate ends and objects of matrimony. No error was committed in granting a decree of divorce to plaintiff.
Under his second assignment of error defendant *Page 144 
asserts that the courts erred in awarding plaintiff an undivided one-fourth interest in and to the real and personal property owned by him.
The decree ordered defendant to pay to the plaintiff within 30 days from the date of the decree the sum of $300, which was the amount of money that plaintiff had at the time of their marriage. Plaintiff was decreed to be the owner of an undivided one-fourth interest (1) in all the real property owned by the defendant, "subject to any mortgage indebtedness outstanding as of the date of the trial of this cause", and (2) in all the personal property owned by the defendant as of the date of the trial of the cause, subject to any indebtedness against such personal property. Included in such personal property was the farm machinery and equipment, household goods, "livestock consisting of hogs, cows, and chickens, harvested crops and cash belonging to the said defendant as of the date of the trial of this cause".
In her complaint plaintiff places the value of the real property at $32,000. One of her witnesses testified that the property was worth $200 an acre. As hereinbefore stated, defendant owned, at the time of his marriage, 80 acres which he had inherited from his father, and 55 acres which he had purchased. At $200 an acre, the value of these two tracts would be $27,000. Defendant testified that there was approximately $4,700 unpaid on the mortgage on the real property and about $1,000 due on the farm equipment.
Prior to the 1947 amendment, to which we shall refer presently, § 9-912, O.C.L.A., as amended by chapter 407, Oregon Laws 1941, provided that upon the dissolution of the marriage, "the party at whose prayer such decree shall be made shall in all cases be *Page 145 
entitled to the undivided third part in his or her individual right in fee of the whole of the real estate owned by the other at the time of such decree". This section, as further amended by chapter 557, Oregon Laws 1947, provides as follows:
 "Whenever a marriage shall be dissolved or annulled, the party on whose prayer the decree shall be given and made thereby shall be awarded in his or her individual right such undivided interest in, or in severalty, such part or parts or the whole of, the real property or personal property, or both, or right, interest or estate in either or both thereof, owned by the other at the time of such decree, as may be just and proper in all the circumstances, in addition to the further decree for maintenance provided for in section 9-914."
In Siebert v. Siebert, 184 Or. 496, 199 P.2d 659, andMorrow v. Morrow, 187 Or. 161, 210 P.2d 101, we had occasion to consider this 1947 amendment. It was there held that since such amendment the statute does not require the court to award to the party not at fault any part of or interest in the real or personal property owned by the other party, but does require the court to award to the one to whom the decree is granted "such undivided interest in, or in severalty, such part or parts or the whole of, the real property or personal property, or both, or right, interest or estate in either or both thereof, owned by the other at the time of such decree, as may be just and proper in all the circumstances".
Much depends upon the particular facts of the individual case in determining the amount of or interest in the property of the other party to be awarded to the party not at fault. The matters to be considered are mostly the same as those pertaining to the allowance *Page 146 
of permanent alimony. 2 Nelson, Divorce and Annulment, 2nd Ed., § 14.135, p. 144. In discussing the question of alimony, we said inSiebert v. Siebert, supra, as follows: "Among the matters to be considered are: The financial condition of the parties; the nature and value of their respective properties; the contribution of each to any property held by them as tenants by the entirety; the duration of the marriage; the husband's income, his earning capacity, his age, health, and ability to labor; and the wife's age, health, station and ability to earn a living."
After carefully considering all the facts and circumstances in this case, we are of the opinion that the decree of the court awarding plaintiff an undivided one-fourth interest in defendant's real and personal property, subject to the indebtedness against it at the time of the trial, should be modified by awarding to her only an undivided one-fourth interest in defendant's real property without being subject to any existing lien or liens. We do not think that the evidence in the case justifies the court in awarding her, in addition to an undivided one-fourth interest in the real property, any interest in defendant's personal property. Defendant shall be required to protect the interest in his real property granted to plaintiff from being sold in satisfaction of any existing lien or liens against it, and shall remove such lien or liens as soon as practicable.
With this modification the decree appealed from is affirmed. Plaintiff will recover costs and disbursements in this court. *Page 147