Argued February 15, reversed March 1, 1956

## ENDICOTT *v.* ENDICOTT

294 P. 2d 335

*Francis F. Yunker,* Portland, argued the cause for appellant. On the brief were Yunker, Fewless & Hannam, Portland.

*McDannell Brown,* of Portland, argued the cause and filed a brief for respondent.

Before Tooze, Acting Chief Justice, and Lusk, Brand and Perry, Justices.

### BRAND, J.

This is a suit for divorce brought by C. B. Endicott against his wife Genevieve Endicott upon the ground of cruel and inhuman treatment, rendering his life burdensome. The defendant filed an answer and cross complaint denying the allegations of the complaint and

seeking a divorce from the plaintiff on the ground of cruel and inhuman treatment. After trial upon the merits the court granted the divorce to the defendant upon her cross complaint and awarded to the defendant the sum of $250 per month to be paid only to a duly qualified and acting conservator or guardian of the estate of the defendant Genevieve Endicott. The plaintiff was decreed to be the owner of any real property, title of which was in his name free and clear of any interest of the defendant. From this decree the plaintiff appeals. The alleged grounds for divorce specified in the plaintiff's complaint are exceedingly brief. They read as follows:

"a. That for some time prior to the marriage of the parties and ever since, this defendant has been addicted to the use of intoxicating liquor and drugs; that at the time of the marriage of the parties, this fact was unknown to this plaintiff;

"b. That as a result of the said addiction to the said liquor and drugs, this defendant has continually embarrassed this plaintiff before his friends and business acquaintances, and has on numerous occasions been arrested and lodged in the City Jail on charges of intoxication.

"c. That this defendant fails and refuses to provide a home for the plaintiff and spends all of her time in beer parlors and away from home."

The answer and cross complaint sets forth the charges against the plaintiff as follows:

"* * * That he habitually harasses and criticizes defendant; that he has required defendant to live with him with plaintiff's mother and sister and other relatives, with whom there has been constant friction and unpleasantness, and in all of which plaintiff takes sides against defendant; that defendant is not permitted any of the usual authority or responsibility about her home but is constantly

dictated to by plaintiff and his relatives; and that plaintiff's conduct in this respect has made life burdensome to defendant and has seriously impaired her health."

The reply is a general denial.

The law defining the character of proof which is required in order to support a claim of cruel and inhuman treatment is firmly established in our decisions and is not in controversy here. See *Billion v. Billion,* 137 Or 622, 1 P2d 1108, 3 P2d 1113; *Neely v. Neely,* 162 Or 610, 94 P2d 300; and *Goodman v. Goodman,* 165 Or 141, 105 P2d 1091. Our only question in this case relates to the application of the law to the evidence.

The parties were married in 1940 and there are no children the issue of the marriage. The only witnesses other than the plaintiff and the defendant were (1) Mrs. Julia Williams who identified hospital records of the Physicians and Surgeons Hospital; (2) Mrs. Rachel Foster who identified records of the Emanuel Hospital; (3) Mrs. Maude Woodworth who identified records of the Oregon State Hospital, all of whom were called by the plaintiff, and Mrs. Rene L. Armstrong, proprietor of the Hollywood Sanitarium, and Mrs. Lucille Schriber, a nurse at the Hollywood Sanitarium, both of whom were called by the defendant. The last two witnesses testified briefly as to the defendant's physical condition over the two months period immediately preceding the trial, which was held on 21 April 1954, and during which period the defendant was a patient at the sanitarium. The testimony relative to the relationship between the parties and their conduct is limited to that of the plaintiff and the defendant. For the purposes of this opinion we shall first consider the testimony of the defendant on which she was

awarded a divorce from her husband. Considered by itself alone her case in chief does not differ greatly from many borderline cases in which a divorce has been granted to the wife.

The defendant's first social meeting with the plaintiff was at a bus depot in Butte, Montana, on which occasion they had a few drinks together, but no one became intoxicated. Defendant testified that at that time she did not make it a practice to use narcotics of any kind, although she did testify that a university doctor had prescribed a mild sedation because of her having had a nervous breakdown from overstudy. That occurred two years prior to their marriage. She also had occasionally taken barbitol. During the four months of their courtship they "usually", but "not frequently" had drinks together, but never became under the influence of liquor. Asked if she had been ejected from the apartment in Butte because of excessive use of liquor or narcotics defendant said "not to my knowledge." Concerning the period following their marriage she testified that she did not use liquor in excessive amounts and did not use narcotics at all. They then went to San Francisco and she did not have any difficulty there over the use of liquor or narcotics "that I know of." She never caused her husband any embarrassment in San Francisco. She does not recall any occasion when she went to his office in San Francisco while under the influence of narcotics or while intoxicated. She has been subject to migraine headaches since she was quite young. She began using sedatives about eight months after their marriage. About two years after their marriage she began using sedatives "on a fairly regular scale or basis." When they came to Portland they lived on a farm near Scappoose.

Mrs. Endicott, Mr. Endicott, and his mother lived together.

In 1935 the defendant had gone to the Mayo Clinic for the cure of migraine headaches, where it had been recommended that she take nembutal. After they came to Oregon she began taking that drug upon a doctor's prescription. She continued taking it under the doctor's prescription for a year and a half. Defendant testified that after they moved to Portland they never had liquor in the house, although she used to go out and drink with the plaintiff's sister.

Defendant complained that while they were living in Scappoose for about three months the plaintiff's relatives practically moved in on them. She complained that she had no social contacts or opportunities to get out or to get away. However, after complaining of the conduct of his relatives she stated that she loved the plaintiff's mother and that the mother was very good and would stand up for her. Defendant claimed that the plaintiff's sister was mean and hateful when she was drunk. Defendant testified that she was not permitted to share in any of the responsibilities pertaining to the home. She testified that her husband was working in Portland, and added, "I don't recall, but I believe on the whole he was home at night." Defendant was not sure where she had resided in Portland after leaving Scappoose. She lived in Portland about three years. Most of the time plaintiff and defendant were alone, but his sister was there part of the time. Plaintiff provided no social life for his wife, nor for himself. They "got thrown out" of the apartment in Portland. She testified that it was by reason of the drinking parties which his sister participated in, and that she (the defendant) was not responsible

for being thrown out. They then moved to another apartment where they remained for about four months. She does not remember whether the sister came with them or not.

In 1947 defendant went to Montana and brought suit for a divorce. Thereafter there was a reconciliation.

Defendant testified that for the first year of their marriage they used to go out together socially and would have a few drinks, but they hadn't done it any since the first year. She testified that after her divorce suit was dropped and the parties resumed living together her life with her husband was pleasant and congenial. She testified further that the filing of the divorce suit by the plaintiff came to her as a shock and that the plaintiff had not discussed it with her and that it was about seven months since he had criticized her conduct with reference to drinking or using sedatives.

With the cross examination of the defendant the case begins to assume a different aspect. She testified:

"Q. Has Mr. Endicott been a good husband to you?

"A. Yes.

"Q. You have no complaint at all, do you?

"A. That is hard to say.

"Q. Well, hasn't he attempted in every way to help you and get you back to normalcy?

"A. No, I wouldn't say in every way."

She was asked if she took any narcotics, to which she answered, "Yes, I did a couple of times on doctor's orders." She testified that Dr. McCallig told her

that she was not an addict. She was taking nembutal. Again we quote from the cross examination:

"Q. Now, Mrs. Endicott, you know all the different types of drugs, sleeping pills and barbitals don't you?

"A. I made study of it, yes.

"Q. Why did you make a study?

"A. Because I was interested in the problem.

"Q. Do you consider yourself at the present time as an addict?

"A. No.

"Q. So there is nothing to stop you from going to work is there?

"A. Yes, I believe there is. I am still very nervous and get awfully weak and get migraine headaches.

"Q. You remember when you filed this divorce in 1947, you alleged that because of your husband's treatment you were confined to the Emmanuel [sic] Hospital and to Salem. Do you remember that?

"A. Yes.

"Q. Was that true?

"A. Yes."

Defendant testified that she was in the Oregon State Hospital. We quote:

"Q. Why did you go to Salem? Were you sent there because of alcoholism and narcoticism?

"A. Not to my knowledge."

The defendant testified that the last time she ever took any barbituates or narcotics was in 1952 which is the year in which the plaintiff filed his complaint for divorce. Again we quote from the cross examination:

"Q. So anything you have ever done since your marriage you were fully cognizant of, weren't you?

"A. It is pretty dim.

"Q. What is dim?

"A. Anything that happened.

"Q. Why is that?
"A. I don't know.

"Q. Well, let's go into the question of did you ever go off to The Dalles with one of Mr. Endicott's men?
"A. Yes.

"Q. What was his name?
"A. I can't remember now.

"Q. Did you know him quite well?
"A. No.

"Q. Casually?
"A. Yes.

"Q. And how long were you in The Dalles?
"A. I am sorry, I can't say.

"Q. Was it a week?
"A. It may have been, I don't know.

\* \* \* \* \*

"Q. (By Mr. Yunker) How did you happen to go down there with him?
"A. Well, I was pretty sick and tired of everything that was going on around me. He seemed a way out and he was very nice to oblige me by taking me out from my circumstances.

"Q. And when Mr. Endicott found you, where were you?
"A. Pardon?

"Q. Where were you when Mr. Endicott found you?
"A. I don't remember.

"Q. Were you under the addiction of narcotics?
"A. No.

"Q. Weren't you in the hotel room together, you and this man?
"A. I suppose.

"Q. Why, don't you remember?
"A. Nothing is very clear to me.

"Q. At any other time did he find you with two other of his employees in a room together in bed?

"A. I don't remember. I can't say definitely.

"Q. What?

"A. I couldn't say definitely."

Again defendant testified that she went to her sister-in-law's home and someone left some whisky. She drank and smoked in bed, fell asleep and ended in the hospital with severe burns. She gives as a reason why she cannot work the lack of concentration and nervousness. She testified that she was in the Oregon State Hospital in March 1945 (1947?).

We will briefly summarize the testimony of the plaintiff in support of his prayer for divorce. He testified that shortly after their marriage he discovered that his wife was an addict. He put her in the hospital to try to cure her. He testified:

"A. * * * By that time they tried to take her off nembutal and then she used something else. Oh, this paraldehyde which is—if you ever smelled paraldehyde—anybody who could use that. She got to drinking that like water. Just a little would be a dose. We got her off of that and then she took up liquor. It was a continual round. I was stubborn. I married her for better and for worse. I tried to snap her out of it. I did that for twelve years."

During the term of their marriage plaintiff had the defendant in at least six hospitals. She was in a hospital in Butte, Montana in 1941; in the Good Samaritan Hospital in 1942; in the Mt. Zion Hospital in San Francisco in 1942; in the Good Samaritan Hospital in 1943; in the Emanuel Hospital in 1943 and again

in 1944. She was also twice in the Hahnemann Hospital, which has since been changed to the Holladay Park Hospital. She was also in Physicians and Surgeons Hospital several times. In the hope of curing her of drug addiction plaintiff then sent her to the Pinel Foundation in Seattle in 1951 where the cost was $125 a week plus doctor bills. She spent the winter there. In 1952 he brought her back from Seattle and "tried to start in over again." She then started in drinking beer. After a few weeks of that the plaintiff testified that he came to the conclusion that he couldn't stand it any longer. He walked out and filed suit for divorce.

At the time the defendant brought suit for divorce against the plaintiff she moved to the Morris Hotel. Plaintiff testified:

"* * * That was a continuous round of drinking and drugs and parties with men and this that and the other. Finally, she landed in jail for drunkenness. I went down and got her out of jail; and we went back together. Not only herself was in jail, but she picked up some crippled man from Finland, somebody she met in the hotel, and it wasn't enough to get her in jail, but she managed to get him in jail."

Plaintiff testified that he had been through the situation so many years that it has made a nervous wreck out of him.

When they were in San Francisco plaintiff was working for the Hearst organization. The defendant came to the office building and borrowed money from his stenographer, from the janitor and the elevator operators, and by reason of her conduct plaintiff lost his job. He was told to either get rid of his wife or lose his position. He answered, "Well, I married her for

better or for worse. You can just keep your job.'' Plaintiff worked a double shift 16 hours a day in order to pay her hospital bills. At a later time the company reemployed him and within two weeks the defendant appeared in the office in a desperate condition, drugged, and caused a commotion. After that she was committed to the hospital. He testified that there was nothing wrong with her except the drug habit. Plaintiff testified further:

"A. * * * Maybe every two years, I wouldn't say exactly how often, I would have to go down and get her out of jail. They would pick her up lying in front of the house or downtown or anywhere, in a drunken condition. I would go down and get her out. I know them all by name: Elizabeth Moorehead in charge of the Women's Protective Bureau, she was at that time, Judge Quillin, Judge Seabrook, since passed away. They all asked me to commit her somewhere to get rid of the drug habit. She asked me not to.''

Plaintiff testified to the same incident to which the defendant referred in her cross examination, as follows:

"Q. Did she ever leave while under the influence of liquor and drugs and end up living with any other men?

"A. Yes, in 1942, the man that was working with me, a man considerable older than me, she left with him and was gone for about two weeks, disappeared somewhere. I went up and had him arrested in The Dalles and put in jail overnight and took her back.

"Q. Where did you find her in The Dalles?

"A. Living with this man in a room, with a bottle of whisky, a quart bottle of whisky on the table, drinking it up.

"Q. Any other time you found her with other men?

"A. Yes, in Butte, Montana, she was in bed with those two men, two men that were working with me. * * *"

Plaintiff testified further that defendant was in jail in Cut Bank, Montana, for being drugged or drunk, and he had to bail her out. Plaintiff testified with great frankness concerning the occasion when he finally left the defendant and filed suit for divorce. We quote:

"A. Well, I will be perfectly truthful with you. After I got her back from this hospital up there. One day she was standing at the top of the basement stairs and the thought came over me. 'What I ought to do is just to shove her down the steps and kill her.' The next morning I walked out and filed suit for divorce because I figured this: When I reached that point, I couldn't go on. That was the absolute breaking point. That is the absolute point. Sometimes one little thing like that will change the course of your life. I thought, 'Well, if that is the feeling, I think it is time to leave.'"

In the presence of plaintiff and defendant the doctor told the defendant, " 'It is impossible for you to be alive with such a bromide level in your blood. It is an impossibility.' She had built up such a resistance to it gradually through continued use, she stayed alive." The plaintiff further testified that prior to the time that he left her she was under the influence of drugs and alcohol ninety per cent of the time. She very seldom had a lucid moment. Plaintiff testified that when the defendant's father died in 1952 after the divorce suit had been filed the defendant was in such a drugged condition that she was unable to go to the funeral.

We turn to the documentary evidence. Exhibit 4 consists of several receipts for fines imposed upon defendant, or for bail on arrest. One is a receipt for $50 cash bail for disorderly conduct, paid in 1951. In the hospital records we find, among many others, the following notations concerning her condition at the various times specified:

Hahnaman Hospital. Received 6/20/44. Discharged 7/14/44. "Drug addiction."

Physicians and Surgeons Hospital. Admitted 11/19/49. Dismissed 12/11/49. "Toxic bromidism."

On January 10, 1950 doctor instructs: "Check patient's personal belongings to be certain she has no medicines (bromide compounds) also that no friends bring in such."

Physicians and Surgeons Hospital. Received 1/6/51. Discharged 1/28/51. "Accute bromidism." "History of taking patent bromide preparations. Convulsions due to withdrawal of bromide."

Physicians and Surgeons Hospital. Received 4/13/51. Discharged 5/7/51. "Patient too confused to give a reliable history. Has been incoherent in past five days because of taking bromides."

Emanuel Hospital. Received 5/15/53. Discharged 7/6/53. "Patient appeared to be confused or dulled mentally. * * * some chronic alcoholism. * * * An alcoholic. * * * Habituated to barbiturates about seven years ago."

Holladay Park Hospital. Received 1/7/54. Discharged 2/2/54. "Habits: Alcoholic, barbiturate addiction."

A comparison of the testimony of plaintiff and defendant will disclose that most of the testimony concerning the misconduct of defendant with other men, her arrests for disorderly conduct, and confinement in jails was uncontradicted. There is a direct conflict as to drug addiction and alcoholism. But in these respects

the hospital records clearly support the plaintiff's testimony. Defendant was for many years an alcoholic and a drug addict. The manner in which she testified corroborates the record in this respect, and the persuasive evidence of her addiction to drugs, of necessity, raises most serious doubts as to her credibility. The evidence does not in any respect support defendant's claim that the plaintiff was responsible for her condition or for the practices which produced it. On the contrary her conduct led the plaintiff to the "brink" of financial ruin. Defendant's claim that she was not permitted to exercise responsible control in the home or to enjoy social intercourse outside the home is explained by the evidence that she was in no condition to assume responsibility or to enjoy social intercourse in public.

It is true that the defendant became a sick woman and was abnormal in some respects. In 1945 she was in the Oregon State Hospital for about six months, but she was there because of her addiction to drugs. The legal standards of decency, the requirements of reasonable self restraint, and the duty to comply with marriage vows are not imposed upon normal persons only, nor can degenerate habits voluntarily acquired serve as excuses for failure to perform those duties. It may be that the trial court was somewhat influenced by the fact that at the time of trial the defendant was in no condition to support herself, and may have felt a normal reluctance to impose the burden of her support upon the taxpayers, but those considerations cannot control our decision in this case.

There is some evidence that within a reasonable time defendant may recover health and self-control sufficiently to enable her to support herself. She is, or has been, an expert stenographer. But if she re-

mains incapacitated it does not necessarily follow that the plaintiff should be required to continue to bear the heavy financial burden which he has carried for many years. He has more than fulfilled his obligations, and the requirements of justice must prevail over the desire for public economy.

The trial court erred in granting a divorce to the defendant and in awarding alimony. The decree is reversed and plaintiff is awarded a divorce from the defendant.

Neither party shall recover costs.